UNITED STATES of America, Appellee,

v.

Neil Russell SEYMOUR, Appellant.

No. 77–1135.

United States Court of Appeals,
Ninth Circuit.

April 25, 1978.

Rehearing Denied May 25, 1978.

Charles M. Dresow, San Francisco, Cal.,
for appellant.

Robert D. Ward, San Francisco, Cal., for
appellee.

Before KILKENNY and HUG, Circuit
Judges, and MURRAY, District Judge.*

KILKENNY, Circuit Judge:

Appellant was indicted, tried, and convicted in a jury trial on thirteen counts of
mail fraud, 18 U.S.C. § 1341 and seven
counts of interstate travel fraud, 18 U.S.C.
§ 2314. Two counts of the twenty-two
count indictment were dismissed at the
commencement of the trial. Appellant was
committed to the custody of The Attorney
General of the United States, or his authorized representative, under 18 U.S.C.
§ 4082(a) for a term of five years under
each count, the sentences to run concurrently. We affirm.

BACKGROUND

Appellant was the founder, president of,
and active promoter of the business activities of Trans-World Leasing Corporation
[Trans-World], an organization created in
mid-September, 1972, for the express purpose of engaging in the business of equipment leasing. Its main office and center of
activity was in San Francisco, where appellant resided. During the years 1972 and
1973, Trans-World, for a fixed price of
$7,500.00 each, sold exclusive franchises in
certain defined territories. The franchise

---

* The Honorable William D. Murray, Senior United States District Judge for the District of Montana, sitting by designation.

granted the purchaser the exclusive right to sell equipment leases in the territory. Under the franchises, the leases would be submitted to Trans-World which would, in turn, "fund" the lease, either from its own funds or by borrowing from an external financing source. The franchise required Trans-World to purchase the equipment and have it delivered to the lessee and, additionally, handle all financial and other details with reference to the lease. The profit from the lease, under the plan, over and above the purchase price, plus loan costs, was to be divided equally between the franchised dealer and Trans-World.

Appellant, as part of its overall plan to attract investors in Trans-World, caused advertisements to be placed in the business opportunity section of numerous newspapers throughout the United States. These advertisements were designed to persuade interested persons to purchase a leasing franchise for $7,500.00. The advertisements included representations that the money invested was, in fact, a security deposit and language which clearly meant that the deposits were guaranteed refundable. These advertisements were prepared by or were personally approved by appellant. Each advertisement directed the reader to call a toll free number at appellant's Trans-World office in San Francisco.

Manifestly, the advertisements were effective. Among the many who responded to the advertisements were seven individuals from various states who invested in the scheme and later testified as government witnesses at the trial. Each of these persons upon calling the toll free number was subsequently called upon by a Trans-World salesman. The seven persons each invested $7,500.00 or more after two or more meetings with the salesman, thereby becoming Trans-World dealers. These persons testified that they were persuaded to part with their money by reason of the advertisements, the representations contained in the prospectus and dealer agreements and the numerous oral representations made by the salesmen. Included in the representations were the following: (1) that the investment would be secured by equipment, (2) that it would be used for leasing equipment, and (3) that it was guaranteed refundable. Each one of the investors testified that in making his decision to invest, he relied particularly on the provision and representation which guaranteed the refund.

The evidence is clear that appellant was personally responsible for the language used in the dealer agreement and prospectus. All Trans-World salesmen reported personally to appellant.

The record is undisputed that in all cases alleged in the indictment, the dealer agreements, the letters of acceptance, and the checks in payment of the franchise license, and other items of communication were transported through the United States mails. From time to time, each dealer traveled interstate in order to attend a two or three day seminar in San Francisco, in which meeting he or she was led to believe they were to be taught the leasing business and receive training to be effective dealers. Although the dealers met with varying amounts of success in securing potential lease transactions, they were uniformly unsuccessful in securing the approval of Trans-World or to finalize a lease. Consequently, each sought a refund from Trans-World. Numerous attempts were made by mail or telephone to personally contact the appellant, but these were unsuccessful. Appellant would either refuse to talk to the dealers or would advise the office secretaries to tell the dealers that he was not available. Occasionally, he instructed the secretaries to tell the dealers their refunds were being processed or were already in the mail, when in truth and in fact no such action had been taken. Additionally, he personally advised some of the dealers that their refunds were on the way. No refunds were made to any of the franchised dealers nor were they given any explanation as to why their investments were not returned.

Time after time during the period under scrutiny, appellant was advised that a Trans-World financial statement was absolutely necessary before outside funding for leasing purposes would be made available. Despite these frequent demands for finan-

cial statements, appellant never prepared one. Manifestly, this refusal to submit financial statements effectively prohibited Trans-World from securing any outside financial assistance. Without this assistance, it was utterly impossible for Trans-World to carry on a successful leasing business. On at least one occasion, appellant was advised, in writing, that his failure to provide financial statements had cost Trans-World well in excess of $100,000.00 in lost business. Nonetheless, he made no effort whatsoever to compile such a statement.

During the 1972–73 period, appellant was also president of Chase Chemical Corporation, purportedly selling products known as Ice-O-Magic and Flame-O-Magic. Substantial funds of Trans-World, a greater part of which came from the sale of franchised dealerships were commingled by appellant with funds of Chase Chemical.

Insofar as can be ascertained, no part of the $67,500.00 invested by the seven persons who appeared as witnesses, was used for leasing, nor were the investments secured by equipment. The many requests for refunds were all ignored by the appellant. Additionally, the record exhibits a glaring lack of good faith intent to create a successful leasing business, including a lackadaisical training of Trans-World dealers. Likewise, it shows a failure to oversee proper establishment of a bookkeeping system, a failure to approve the majority of the dealer leases submitted to Trans-World and wholly inadequate provisions for dealer field assistance and promotional advertising. There is substantial evidence in the record supporting the above factual background.

## ISSUES ON APPEAL

Appellant assigns three errors:

I. That the court's instruction on good faith as a defense to the charges was wholly inadequate.

II. That the district court's pretrial discovery order violated his Fifth Amendment self-incrimination right.

III. That the evidence was insufficient to sustain a verdict of guilty on any one of the counts.

## GOOD FAITH INSTRUCTION

On the issue of good faith, the court instructed the jury as follows:

"If the evidence in the case leaves the jury with a reasonable doubt whether the accused in good faith believed the representations regarding the business as conducted by Trans World leasing to be true at the time the documents or letters were mailed, then the jury should acquit the accused."

Additionally, the court told the jury:

"The letter mailed need not itself disclose any intent to defraud, nor show on its face that it was mailed in furtherance of a scheme to defraud. But it is necessary that the evidence in the case establish beyond a reasonable doubt that the letter was willfully mailed, or caused to be mailed, by the accused, with the intent to help carry out some essential step in the execution of the scheme to defraud alleged in the indictment.

"To act with 'intent to defraud' means to act knowingly and with the specific intent to deceive, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self."

The court then continued:

"The crimes charged in this case are serious crimes which require proof of specific intent before the defendant can be convicted. Specific intent, as the terms implies, means more than a general intent to commit the act. To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids, purposely and intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case. Act or a failure to act is knowingly done if done voluntarily and intentionally, not because of mistake or accident, or other innocent reason."

Appellant argues that the instructions were inadequate under the principles taught in *Steiger v. United States*, 373 F.2d 133 (CA10 1967), and *Hawley v. United*

**1348**

*States,* 133 F.2d 966 (CA10 1943). Neither of these cases support appellant's argument that the court's "good faith" instruction was inadequate.

In *Hawley,* the district court gave a particularized good faith instruction which was challenged by defendant as inadequate. The court did not speak to the issue of whether such a detailed instruction was required—it merely held that the instruction was proper. In *Steiger,* the court was faced with the failure of the district court to give any instruction on good faith. There, the court properly ruled that a good faith instruction similar to the one proposed by appellant should have been given. The instruction requested in *Steiger* bears a marked similarity to the one before us. *Steiger* stands for nothing other than that such an instruction should have been given. Obviously, the *Steiger* court would have approved the instruction before us.

That the Tenth Circuit does not require a detailed good faith instruction such as was before the court in *Hawley,* is made clear by its decision in *Sparrow v. United States,* 402 F.2d 826 (1968), in which the court approved a good faith instruction which did not measure up to the detail of those before the court in either *Steiger* or *Hawley.* In comparing the instruction before it in *Sparrow* and those before it in *Steiger* and *Hawley,* the court said:

> "This instruction is not as complete as the instruction given in . . . [*Hawley* and *Steiger*] . . . but in our opinion it was adequate. It was a separate instruction on defendant's theory of the case which stated that if they believed that the defendant acted in 'good faith', the jury would be obligated to find him not guilty." 402 F.2d at 829.

The instruction before us is obviously patterned after the good faith instruction, § 47.13, Devitt & Blackmar, Federal Jury Practice and Instructions, page 317.[1] As reflected in the authors' notes on pages 317, 318 and 319, the Devitt & Blackmar instruc-

tion has been approved, as modified, in numerous cases from various circuits.

While a trial court must instruct on the defendant's theory of the case, the instruction need not be in the precise language requested by defendant. *United States v. Kaplan,* 554 F.2d 958, 968 (CA9 1977). Moreover, the refusal to give a requested instruction is not error "if the charge as a whole adequately covers the theory of the defense." *Kaplan, supra,* at 968. It follows that the adequacy of the jury instructions is not to be determined by the giving, or failure to give, any one or more instruction, but by examining the instructions as a whole. *Kaplan, supra,* at 968. *United States v. Kennedy,* 564 F.2d 1329, 1338 (CA9 1977).

We hold that the lower court's instruction on good faith was adequate. Moreover, when viewed in their entirety, the instructions thoroughly acquainted the jury with the terms "knowingly," "wilfully," "specific intent," and "intent to defraud." The given instructions gave the jury sufficient guidance to consider evidence relating to appellant's "good faith" defense. He was entitled to no more.

### THE DISCOVERY ORDER

■ Early in the proceeding, the district judge ordered the parties to exchange lists of witnesses, summaries of witnesses' testimony and copies of all exhibits that would be used at trial. A compliance date was set for one week prior to the trial. The record makes it clear that for all practical purposes the appellant ignored the order. He did not file a witness list until the morning of the trial. This list did not give the addresses of the witnesses, nor did it contain a summary of each witness's testimony, or any summary at all. Furthermore, the exhibit list was not furnished until the trial had been in progress for five days and then gave little, if any, information on what the exhibits contained. At no time, did appellant make an objection to the court's order, unless it

---

1. "§ 47.13 *Good Faith Belief in Truth of Statement*

On the other hand, if the evidence in the case leaves the jury with a reasonable doubt whether the accused in good faith believed the financial statement to be true at the time it was mailed, then the jury should acquit the accused."

could be said that his refusal to comply amounted to an objection. Above and beyond everything else, the appellant does not point to how or in what manner he was prejudiced by revealing the names of witnesses without giving addresses or a summary of the witness's testimony, or by the late furnishing of an exhibit list which did not describe the nature of the exhibits. Under certain circumstances an erroneous ruling is presumed to be prejudicial. There is no logical reason to apply that rule under these facts.

While we do not approve the entry of the subject order and do not sanction a practice which would require a defendant to supply information beyond the provisions of Rule 16, F.R.Crim.P., we cannot say that what occurred here affected the substantial rights of the appellant. Nor do we find that the entry of the trial court's order in and of itself constituted error of a constitutional dimension. Portions of the trial court's order relating to mutual pretrial production of witnesses' names and addresses may in fact be constitutionally permissible, *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). However, appellant's minimal compliance with and his failure to object to the order presents a record which is without a showing of prejudicial effect and inappropriate for constitutional consideration. Moreover, we find that the evidence against appellant was so overwhelming that any constitutional error would be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *United States v. Petrucci*, 486 F.2d 329 (CA9 1973), *cert. denied* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974).

## SUFFICIENCY OF THE EVIDENCE

■ Our analysis of the complete record convinces us that the evidence when viewed in the light most favorable to the government, clearly supports the verdict under the standard of *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). A more detailed recital of the facts would only add to the length of the opinion and would not be beneficial to the public, the courts, or the bar.

## CONCLUSION

Finding no error, we must affirm the judgment of the lower court.

IT IS SO ORDERED.

HUG, Circuit Judge, concurring:

I join in the opinion of the court, but I add these comments concerning the majority's discussion of the discovery order involved in this case.

Rule 16 of the Federal Rules of Criminal Procedure provides for certain pretrial discovery by the government and the defendant. Rule 12 of the Federal Rules of Criminal Procedure also provides for discovery and disclosure of certain information in the event the defendant intends to offer the defense of alibi. The discovery order here involved required the defendant to supply information beyond the provisions of Rules 16 and 12.1.

The prosecution complied with the order for discovery; but, as the majority points out, the defendant, for all practical purposes, ignored it. Furthermore, the defendant did not object to the order, nor has he shown any prejudice suffered because of his minimal compliance with the order. I also agree that the mere entry of the order, together with the defendant's minimal compliance, was harmless error beyond a reasonable doubt.

However, I am concerned about the statement of the majority that the evidence against the defendant was so overwhelming that any constitutional error would be harmless beyond a reasonable doubt. Assuming, *arguendo*, that there was a constitutional violation, the mere fact that the evidence was overwhelming is not a justification for classifying the error as harmless, under the *Chapman* standard. The proper inquiry is whether the prosecution has been able to demonstrate, beyond a reasonable doubt, that the constitutional error involved did not contribute to the defendant's conviction, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Compliance with a discovery order which violated the constitutional rights of the defendant could well produce overwhelming

evidence, yet this would not justify the application of the harmless error doctrine, since the constitutional error would have contributed to that overwhelming evidence and thus to the defendant's conviction. In this case, the prosecution has been able to demonstrate that the minimal compliance with the order by the defendant could have had no effect on the verdict, not because the evidence was overwhelming, but because of the insignificance of the material produced in response to the order.