**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Benjamin Lloyd HICKS, Defendant–
Appellant.**

No. 95–30342.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 18, 1996.

Decided Dec. 24, 1996.

Mark Bennett Weintraub, Assistant Federal Public Defender, Eugene, OR, for defendant-appellant.

Baron C. Sheldahl, Assistant United States Attorney, Portland, OR, for plaintiff-appellee.

Before ALDISERT,* PREGERSON, and T. G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Benjamin Lloyd Hicks ("Hicks") appeals his conviction and sentence for armed carjacking (18 U.S.C. § 2119(2),(3)), unlawful use of a firearm during a crime of violence (18 U.S.C. § 924(c)(1)), and being an armed career criminal (18 U.S.C. §§ 922(g), 924(e)). We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I. FACTS

On May 31, 1993, Orville Rondeau ("Rondeau") took a 9mm Ruger semi-automatic pistol from a residence in Klamath Falls, Oregon, showed it to friends at a girlfriend's house, and later met with Hicks and Justin Harrington ("Harrington").[1] Hicks stated that he knew a place "out by the lake" where they could shoot the gun, so the three of them took the gun and a bottle of wine and left in an El Camino truck driven by Harrington.

At about the same time, the victims, high school students Kimberly and Kenneth, were parked in a Chevrolet Citation at a location just west of Klamath Falls. The El Camino pulled up beside the Citation and the three men got out. Hicks approached the Citation and asked Kenneth for a cigarette. Then, according to Rondeau, the three men took turns shooting the gun towards an empty field and a road sign. After the men returned to the El Camino and started to leave, Hicks suddenly jumped out of the truck, ran across the hood yelling obscenities, and confronted Kimberly with the gun. Hicks ordered Kimberly and Kenneth to get out of the car, and he locked them in the trunk of the Citation. Harrington then attempted to turn the El Camino around, but instead drove it into a ditch where it was abandoned and later recovered by police.

The three men got in the Citation with the victims locked in the trunk, and Hicks drove to a gravel pile northeast of Klamath Falls. Kimberly and Kenneth were released from the trunk and separated. Kimberly was forced to commit oral sodomy on Hicks while he sat in the front seat of the Citation.

---

* Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. Rondeau and Harrington, the other two participants in the events of May 31, were prosecuted in the Oregon circuit courts. They are not parties to this appeal. In exchange for a reduced sentence and dismissed charges in state court, Rondeau pleaded guilty to felony murder and agreed to testify at the trials of Harrington and Hicks.

Hicks placed the gun on the car's dashboard. Kimberly then was raped and sodomized repeatedly.

Meanwhile, Harrington beat Kenneth (who had been tied and gagged) in the head with a large piece of broken asphalt, eventually killing him. Hicks and Rondeau dragged Kenneth's body to a pile of gravel where they kicked loose rocks over it.

Hicks retrieved the gun and attempted to shoot Kimberly, but Rondeau stopped him. Kimberly had been covered with a sleeping bag, and after Kenneth's body was buried, she was forced back into the trunk of the Citation where she lost consciousness. Hicks drove the Citation to another location outside of Klamath Falls where Kimberly was again removed from the trunk. Hicks then threw a large piece of asphalt at her head. The three men left Kimberly on the roadside and drove away in the Citation, eventually abandoning the car in downtown Klamath Falls. On the morning of June 1, 1993, a neighbor found Kimberly and called the police.

Following a jury trial, Hicks was found guilty on August 1, 1995, of armed carjacking, unlawful use of a firearm during a crime of violence, and being an armed career criminal. On October 17, 1995, the district court sentenced Hicks to life imprisonment on the carjacking and armed career criminal counts, plus five years on the unlawful use of a firearm count, to be served consecutively to the sentence of life imprisonment. Hicks timely appeals.

## II. THE ISSUES ON APPEAL

Hicks makes six arguments on appeal: (a) that the district court violated Rule 16 of the Federal Rules of Criminal Procedure by ordering Hicks to file a witness list and summary of anticipated witness testimony prior to trial; (b) that it was error to admit evidence of the murder, rape, and assault; (c) that it was error to admit expert testimony regarding the deoxyribonucleic acid ("DNA") testing method known as polymerase chain reaction ("PCR"); (d) that it was error to exclude expert testimony regarding eyewitness identification; (e) that Congress exceeded its power under the Commerce Clause in enacting the carjacking statute; and (f) that it was error to impose a life sentence.

### A. Rule 16 and the Discovery Order

At a hearing on June 6, 1995, the district court ordered that the parties file witness lists and short summaries of anticipated witness testimony. Hicks filed written objections, and the district court denied them. On July 13, 1995, Hicks moved for a protective order that would allow him to file the anticipated testimony under seal. At a hearing on July 13, 1995, the district court denied the motion and ordered Hicks "to immediately provide summaries of the anticipated testimony of witnesses." Hicks complied with the order and now argues on appeal that the district court did not have the authority under Rule 16 of the Federal Rules of Criminal Procedure to issue such an order. We agree that the district court committed error, but the error was harmless.

■ We review the scope of the district court's authority to order discovery under Rule 16 de novo. United States v. Gonzalez–Rincon, 36 F.3d 859, 865 (9th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995); United States v. Mandel, 914 F.2d 1215, 1219 (9th Cir.1990).

Rule 16 sets out in some detail the type of material that is subject to discovery from the Government and the defendant. By its literal terms, Rule 16 does not require the defendant to disclose anything to the Government before trial. Subsection(b)(1) of Rule 16 requires a defendant to disclose exhibits and documents "which the defendant intends to introduce as evidence in chief at the trial" and a written summary of the names, anticipated testimony, and bases for opinions of experts the defendant intends to call at trial under Rules 702, 703, and 705 of the Federal Rules of Evidence, if the defendant has requested such discovery from the Government and the Government has asked for reciprocal discovery. Rule 16 also explicitly limits the scope of the disclosure which is required:

> Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or the defendant's

attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by government or defense witnesses, or by prospective government or defense witnesses, to the defendant, the defendant's agents or attorneys.

Fed.R.Crim.P. 16(b)(2).

The most controversial amendments proposed to Rule 16 in the last twenty years have been those concerning the inclusion of witness lists and summaries of anticipated witness testimony among the material discoverable from both parties. In 1974, an amendment was proposed that would have explicitly authorized the discovery of witness lists, including the names, addresses, and prior criminal record of anticipated witnesses. *See* 1974 Amendment, *reprinted in* Federal Criminal Code and Rules, at 76–80 (West 1996).

In a Conference Committee, Congress noted that under the current law, "[t]he defendant never needs to turn over a list of his witnesses." *See* 1975 Enactment, *reprinted in* Federal Criminal Code and Rules, at 81 (West 1996). The House version of the amendments would have allowed both sides to discover the names and addresses of witnesses three days before trial. The Senate version "eliminates these provisions, *thereby making the names and addresses of a party's witnesses nondiscoverable.*" *Id.* at 83 (emphasis added). The Conference Committee adopted the Senate version, noting that its members "believe it is not in the interest of the effective administration of criminal justice to require that the government or the defendant be forced to reveal the names and addresses of its witnesses before trial." *Id.*

In 1993, Rule 16 was amended to add subdivisions (a)(1)(E) and (b)(1)(C) that now permit the discovery of a party's intent to rely on expert opinion testimony, a summary of what the testimony will consist of, and the bases of the testimony. *See* 1993 Amendment, *reprinted in* Federal Criminal Code and Rules, at 83–84 (West 1996). The advisory notes make clear, however, that these subdivisions do not apply to witnesses who may offer lay opinion testimony or to summary witnesses who testify under Federal Rule of Evidence 1006. *Id.* at 84. Of course, these subdivisions also do not, by their terms, extend to other witnesses that the Government or the defendant may call at trial.

We were faced with this type of discovery order one previous time in *United States v. Seymour*, 576 F.2d 1345 (9th Cir.), *cert. denied*, 439 U.S. 857, 99 S.Ct. 171, 58 L.Ed.2d 164 (1978). In *Seymour*, the district court, early in the proceeding, "ordered the parties to exchange lists of witnesses, summaries of witnesses' testimony, and copies of all exhibits that would be used at trial." *Id.* at 1348. Unlike the defendant in this case, however, Seymour ignored the order, never attempted to comply with it, and made no objection to it at any time until appeal. We held:

> While we do not approve the entry of the subject order and do not sanction a practice which would require a defendant to supply information beyond the provisions of Rule 16, F.R.Crim.P., we cannot say that what occurred here affected the substantial rights of the appellant. Nor do we find that the entry of the trial court's order in and of itself constituted error of a constitutional dimension.

*Id.* at 1349. Therefore, in *Seymour* we disapproved of the practice followed by the district court and assumed, for the purpose of the argument, that the district court had committed error.

■ We now make explicit what was implicit in *Seymour*. A district court that orders the Government and the defendant to exchange witness lists and summaries of anticipated witness testimony in advance of trial has exceeded its authority under Rule 16 of the Federal Rules of Criminal Procedure and has committed error. The district court committed error here.

We recognize that this holding continues to conflict with case law from the Fourth Circuit. The Fourth Circuit reviews discovery orders made pursuant to Rule 16 for an abuse of discretion, *United States v. Fletcher*, 74 F.3d 49, 54 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 157, 136 L.Ed.2d 101 (1996), while we review a district court's discovery authority under Rule 16 *de novo*,

*Gonzalez–Rincon,* 36 F.3d at 865. In *Fletcher,* the Fourth Circuit applied the weaker standard to a district court's order requiring the exchange of witness lists before trial. In upholding the validity of the order, the court cited *Seymour* with approval, stating that we "disfavored" such an order, but that such orders do not affect the substantial rights of defendants. *Fletcher,* 74 F.3d at 54. This understates the force of our opinion in *Seymour.* In *Seymour,* we stated explicitly that we did not approve of such district court practices, but that since the defendant had ignored the order and never attempted to comply, his substantial rights could not have been affected. That is not to say that there could *never* be a case where such a discovery order would affect and prejudice the substantial rights of the defendant. The defendant in *Seymour* simply was not harmed by the discovery order because he ignored it.[2]

■ We are faced with the same situation here. Our holding that the district court exceeded its authority under Rule 16 does not end the inquiry. We must next determine whether the discovery order resulted in prejudice to the substantial rights of Hicks. *See United States v. de Cruz,* 82 F.3d 856, 866 (9th Cir.1996). Because this error is not of constitutional magnitude, the Government must show that the prejudice resulting from the error was more probably than not harmless. *United States v. Erickson,* 75 F.3d 470, 479 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1853, 134 L.Ed.2d 953 (1996); *United States v. Vgeri,* 51 F.3d 876, 882 (9th Cir.1995).

■ In this case, Hicks did not suffer any prejudice at all and may have even benefitted from the discovery order by receiving a witness list from the Government. Hicks did not file his witness list until after he received the Government's list of thirty-nine witnesses. His list named forty-seven wit-

nesses. Of those forty-seven, sixteen were on the Government's list. Another twenty witnesses were names that had been provided to Hicks by the Government through the open-file discovery process. Six witnesses were expert witnesses whose names Hicks was required to disclose under Rule 16.

Only five of the names on the defendant's list were unknown to the Government prior to the filing of the list: an unnamed Nike records custodian, Cindy Laws, Toni Pisani, Carolyn Schonchin, and Lauren Schonchin. Of those five, Hicks only called Carolyn Schonchin to testify at trial. She testified, *in toto,* that Hicks owned more than one pair of shoes and that a minor Government witness was not a truthful person. The disclosure of the witness list does not demonstrate any prejudice to Hicks.

Hicks also argues that the summaries of anticipated witness testimony required him to reveal defense strategy and case theory. The summaries, however, were neither witness statements nor mental impressions of the defense attorney constituting work product. For most of the witnesses, the summaries merely identified the potential witness and vaguely stated the portion of the case in which the witness would testify. For twelve of the witnesses, the defendant's summary simply referred to the Government's own witness list and summary. The order requiring Hicks to provide summaries of anticipated witness testimony likewise did not prejudice his substantial rights.

The district court exceeded its authority under Rule 16 and committed error by ordering the parties to exchange witness lists and summaries of anticipated witness testimony before trial. The error, however, was harmless.

### B. *The "Other Acts" Evidence*

■ On July 20, 1995, the district court denied a motion by Hicks to exclude evidence

---

**2.** The Fourth Circuit also heavily discounts the significance of the conference committee notes to Rule 16 discussed above. *See Fletcher,* 74 F.3d at 54 n. 2. Though the court is correct that the comments of the conference committee "do not have the force of law," they certainly constitute important legislative history and statements of policy that are helpful in the interpretation of the language and scope of Rule 16. The committee

expressed its clear understanding that Rule 16 did not authorize the exchange of witness lists or summaries of witness testimony before trial. These policy statements, combined with the explicit terms of Rule 16 that authorize the discovery of specific material, but do not include witness lists or summaries of testimony, support our conclusion here that such discovery orders are not authorized by Rule 16.

concerning murder, rape, or assault. Hicks argues on appeal that the evidence was improperly admitted because it was not relevant to the carjacking or firearm charges and any probative value was substantially outweighed by the prejudice suffered by Hicks. We review the district court's ruling regarding the relevance of this evidence for an abuse of discretion. *United States v. Vaandering*, 50 F.3d 696, 704 (9th Cir.1995); *United States v. Rice*, 38 F.3d 1536, 1542 (9th Cir.1994). We conclude that the district court did not abuse its discretion by admitting evidence of rape, murder, and assault.

■ This evidence is admissible under the terms of the carjacking statute itself. At the time the crime was committed, 18 U.S.C. § 2119 stated:

> Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury ... results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.[3]

The murder of Kenneth, the rape of Kimberly, and most of the acts of assault committed by Hicks and his two cohorts occurred at the gravel pile, not the location where the carjacking crime began. However, under either the "force, intimidation, or violence" element or the "person or presence" element of the carjacking statute, this evidence is admissible.

The Government cites *United States v. Rivera–Gomez*, 67 F.3d 993 (1st Cir.1995), to support its argument that the murder, rape, and assault were part of the "force, violence, and intimidation" requirement of the carjacking statute. In *Rivera–Gomez*, the defendant's accomplice shot and killed the victim at the initial encounter. The court found this evidence helpful to prove the "force and violence" element, commenting:

> It is difficult to conceive of a situation in which the death of a victim will not be relevant to the use of force and violence during the commission of an attempted carjacking.

*Id.* at 996.

In this case, the murder, rape, and assault occurred long after the initial taking of the Citation at a different location. However, the carjacking did not end at the moment Kimberly and Kenneth were locked in the trunk of Kimberly's car. The vehicle was not taken from the person or presence of both victims until Kimberly was dumped along the side of the road after the group had left the gravel pile.[4] This event occurred after the murder and rapes had been completed. After Kimberly was dumped, the three attackers drove the car to Klamath Falls and abandoned it in an alley.[5] Because the commission of the carjacking crime continued until Kimberly was dumped along the road, the evidence of murder, rape, and as-

---

3. Two things are important to note at this point. First, the carjacking statute has since been amended to substitute "with the intent to cause death or serious bodily harm" for "possessing a firearm as defined in section 921 of this title." This amendment would not affect our analysis.

  Second, the Government's indictment was phrased in such a way as to require proof that Hicks used "force, violence, *and* intimidation" to take the car from the "person *and* presence" of Kimberly and Kenneth (emphasis added). This language is more than the terms of the statute require to secure a conviction.

4. Locking the victims in the trunk of the stolen automobile is analogous to the criminal forcing the victims at gunpoint to drive to a remote location and killing them there, making the carjacking a continuous transaction that is not complete until the victims have been separated from their vehicle (i.e. "takes ... *from* the person or presence of another ..." 18 U.S.C. § 2119). Whether the victims are in the trunk or in the front seat is of no moment.

5. The defendant's attorney conceded at oral argument that the carjacking continued until the car was abandoned in Klamath Falls. We need not extend the carjacking quite so far to reach the conclusion we do here. It is sufficient to say that the carjacking continued until Kimberly was permanently separated from her car.

sault was logically relevant to prove elements of the carjacking charge.

■ The district court also reviewed the challenged evidence to determine whether its probative value was substantially outweighed by the danger of unfair prejudice to Hicks. Fed.R.Evid. 403. Though the district court did not explicitly refer to Rule 403 in its evaluation of this evidence,[6] it did reserve judgment on the relevance of particular exhibits relating to the murder, rape, and assault and ultimately excluded several of the Government's exhibits as too prejudicial. Of course, all evidence that is harmful to the defendant's case is prejudicial and that is certainly true when the evidence concerns such horrible events as murder and rape. However, in this case, the evidence of murder, rape, and assault had the significant probative value of relating directly to elements of the carjacking offense, allowing the Government to offer "a coherent and comprehensible story regarding the commission of the crime," *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012–13 (9th Cir.1995), and assisting the Government in its explanation of why Kenneth was not present to testify at trial, how Kimberly got out of the trunk of her car alive, and how police were able to recover the Citation and gather evidence at the gravel pit, saving the jury from having to deliberate in a vacuum about those issues. Therefore, we conclude that the district court did not abuse its discretion in admitting the evidence of murder, rape, and assault.

### C. *PCR DNA Testing*

■ During trial, the Government sought to introduce DNA evidence extracted from a vaginal swab taken from Kimberly after her ordeal. The Government's expert proposed to testify that, as a result of a DNA testing procedure known as PCR, none of the three perpetrators could be excluded as a contributor to the sample. Hicks objected, and the district court held a hearing to determine whether the PCR expert testimony was admissible. After hearing testimony from numerous experts and reviewing affidavits supplied by the defendant, the district court overruled the objections and admitted the PCR results. Hicks appeals that ruling. We review the district court's ruling on the admissibility and relevance of DNA evidence for an abuse of discretion. *United States v. Chischilly*, 30 F.3d 1144, 1152 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995). We conclude that the district court did not abuse its discretion by admitting the PCR results.

The evidence that Hicks challenges here is limited to PCR DNA testing results, not the RFLP DNA testing results that were also offered by the Government.[7] In the federal courts of appeal, whether PCR evidence is admissible in criminal trials is an issue of first impression. Therefore, some discussion of the PCR method of testing DNA evidence is appropriate.[8]

DNA constitutes the basic building blocks of heredity that determine the biological characteristics of all living things. Each nucleus of each cell in the human body contains 46 chromosomes, each of which contains the DNA for thousands of genes. Each set of chromosomes contains approximately 3.3 million base pairs. The string of pairs consists of four different organic bases, labeled A, C,

---

6. "The district court need not recite the Rule 403 test when balancing the probative value of evidence against its potential for unfair prejudice." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir.1992).

7. RFLP (Restriction Fragment Length Polymorphism) DNA testing is a much more detailed analysis of long strands of DNA, seeking to establish a statistical "match" between a sample and a particular individual. The admission of RFLP evidence was approved by this circuit in *United States v. Chischilly*, 30 F.3d 1144 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995).

8. Some of the background material that follows comes from the recent Oregon Supreme Court opinion of *State v. Lyons*, 324 Or. 256, 924 P.2d 802 (1996), allowing the admission of PCR results in criminal trials. *Lyons* is an important case to consider for two reasons. First, both parties cited and discussed the Oregon Court of Appeals case in the district court and in their briefs to this court. Second, the *Lyons* court allowed admissibility of PCR test results under a more demanding standard than federal courts require.

G, and T for short. A pairs with T, and C pairs with G. Therefore, if one side consists of the sequence GTCCGAT, the opposite side is CAGGCTA. This sequence carries the genetic code. Through most of this string, the sequence of pairs is nearly identical in every human being. Some parts of the string, however, vary from individual to individual. These areas of difference command the attention of forensic scientists.

The types of cells that are of most interest for DNA testing and analysis include white blood cells, sperm cells, hair root cells, and cells in saliva. To analyze samples of these cells, the DNA must first be extracted from the sample. There are various methods of extraction that vary with the type of sample. These methods have not generated significant controversy. It is the testing and analysis process following extraction that is the subject of this appeal.

After extraction of the DNA from a collected sample, a forensic laboratory will often estimate the quantity of DNA in each sample. The amount of DNA required for testing varies for different procedures. RFLP analysis, which often generates specific results and statistical "matches" of a sample to a particular individual, requires a relatively large sample with a high quality in order to generate viable results. Because forensic evidence is sometimes old, degraded, or of smaller quantity than RFLP requires, the newer PCR testing method is frequently employed by forensic scientists.

The PCR method can test much smaller samples than the RFLP procedure. However, PCR testing is generally not used as a method to establish a statistical "match" between a sample and an individual, but, rather, is used as a technique to *exclude* certain individuals as possible contributors to a particular sample. The PCR method itself is not a genetic test; it is a mere amplification technique. There are basically three phases to the PCR technique. First, a fragment of DNA is extracted from a sample of evidence. Second, during the amplification phase, millions of copies of the fragment are created by mixing the sample with enzymes, chemicals, and primers. Third, the finished product is tested for comparison with a known DNA sample from a victim or suspect.

Each individual has a particular "type" that appears following PCR testing, called an "HLA–DQ alpha genotype." Experts on both sides in this case agree that there are only 21 possible types that can be found in humans. The frequency of occurrence for each PCR type varies throughout the human population. In this way, PCR testing can be compared to the more traditional methods of forensic testing, including the use of blood type evidence (under the ABO system) or hair sample evidence. Neither of the traditional methods singles out a particular individual as matching a particular sample, but both methods can exclude individuals as possible contributors if they are not within the blood type or hair sample type. The use of PCR typing to exclude individuals as possible contributors to a particular DNA sample is strikingly similar.

Our legal analysis begins with the teaching of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993), wherein the Supreme Court held that Federal Rule of Evidence 702 commands the primary focus for courts evaluating the admissibility of expert testimony. Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." Fed.R.Evid. 702. The Court established the following non-exclusive list of factors to guide the assessment of the reliability of scientific evidence: (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is generally accepted. *Id.* at 593–94, 113 S.Ct. at 2796–97. This inquiry is "a flexible one" focusing on "the principals and methodology underlying the proffered evidence rather than the conclusions they generate." *Chischilly*, 30 F.3d at 1152.

The district court made the admissibility of PCR testing contingent on the Government making the required *Daubert* showing. After hearing extensive oral arguments and testimony from experts on both sides, the district court ruled that the evidence would be admissible under Federal Rules of Evidence 702 and 403.

■ Hicks challenges the reliability of the PCR DNA testing method by arguing that PCR is especially susceptible to contamination. The Government disputes this claim and presented extensive evidence at trial on the procedures and protocols used to avoid contamination. The issue of contamination in PCR testing was also raised in *State v. Lyons*, 324 Or. 256, 924 P.2d 802 (1996). We agree with the following portion of the Oregon Supreme Court's holding:

> Those concerns may arise with respect to any forensic evidence. The potential for contamination may present an open field for cross-examination or may be addressed through the testimony of defense experts at trial, as is true with other forensic evidence. However, it does not mean that the PCR method itself is inappropriate for forensic use. The possibility of human error does not prevent scientists from relying on scientific analysis if safeguards against such errors exist and are followed. Courts do not require that scientific tests be infallible to be admissible.

*Id.* 924 P.2d at 813. We were faced with a similar argument against RFLP testing in *Chischilly.* We held that the "impact of imperfectly conducted laboratory procedures" is better approached "as an issue going not to the admissibility, but to the weight of the DNA profiling evidence." *Chischilly*, 30 F.3d at 1154. In this case, Hicks not only engaged in extensive cross-examination on the issue of contamination, but he also called his own experts to testify to the dangers of contamination in PCR test-

ing. These challenges to the laboratory protocols used in PCR testing do not weigh against the admissibility of PCR results in criminal trials.

■ Hicks also argues that the results do not assist the trier of fact because the crime lab conducting the testing did not include a population data base for Native Americans.[9] This issue was also raised in *Chischilly* to challenge the statistical bases for RFLP testing. 30 F.3d at 1153. However, unlike *Chischilly*, the PCR testing in this case did not result in a statistical probability that Hicks contributed to the sample; it *only* concluded that Hicks could not be excluded as a contributor to the sample.[10] As we discussed above, there are only 21 possible PCR types found in human beings. Their probability of occurrence in the general population or in the Native American population was not relevant to the expert's conclusion in this case.

■ Finally, the district court was required to balance the probative value of the PCR results against the prejudice to Hicks of the evidence under Rule 403 of the Federal Rules of Evidence. Besides the doubtful prejudice that the single PCR result produced in this case (since none of the three perpetrators could be excluded as possible contributors to the sample), the evidence had the probative value of helping to identify the carjackers. It was almost certainly not sufficient evidence to identify Hicks as one of the carjackers, but it helped to corroborate other evidence of identity to build a wall of evidence supporting that conclusion. The probative value of the PCR results was not substantially outweighed by the prejudice to Hicks of the evidence.

Though PCR forensic testing is relatively new to the federal appeals courts,[11] its novelty should not prevent the district court from exercising its sound discretion in admitting such evidence once a proper *Daubert* show-

---

**9.** Hicks, Harrington, and Rondeau are all Native Americans.

**10.** As a tangential benefit, the elimination of the statistics from the Government expert's conclusion probably also made the results more understandable and less confusing to the jury.

**11.** The Oregon Supreme Court in *Lyons* cited numerous state appeals courts that have approved the admission of PCR evidence, and regarding peer review, the Court cited a bibliography listing over 4,000 scientific articles and publications relating to PCR. *Lyons*, 924 P.2d at 813–14.

ing has been made. The district court did not abuse its discretion here.

#### D. *Eyewitness Expert Testimony*

On July 20, 1995, the district court denied a motion by Hicks for an order allowing him to present expert testimony concerning eyewitness identification. Hicks appeals this ruling. We review the district court's exclusion of expert testimony on the reliability of eyewitness identification for an abuse of discretion. *United States v. Rincon,* 28 F.3d 921, 923 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 605, 130 L.Ed.2d 516 (1994). We conclude that the district court did not abuse its discretion in excluding the eyewitness expert offered by Hicks.

After *Daubert* was decided, we emphasized in *Rincon* that the determination of the admissibility of expert testimony concerning eyewitness identification should be based on an individualized inquiry, rather than strict application of the past rule that summarily excluded such testimony. *Id.* at 926. The district court had the discretion to admit the testimony of the expert offered by Hicks upon a *Daubert* showing if it would have been helpful to the jury. *See id.*

The expert offered by Hicks would have testified about the stages of identification and concepts such as "weapons focus" and "cross-cultural identification." After reviewing the expert's report, reviewing the scientific literature, and hearing oral arguments, the district court concluded that the proffered evidence would not assist the trier of fact. The district court excluded the evidence under Rule 403 of the Federal Rules of Evidence, concluding:

Even assuming that the proposed expert testimony constitutes scientific knowledge under *Daubert* and *Rincon,* I will exclude it. I do not believe it will materially assist the trier of fact more than other traditional methods of challenging eyewitness identification. And I conclude that it is likely to confuse or mislead the jury, and frankly, waste our time at the trial. The same information can be conveyed through cross-examination and in an appropriate comprehensive jury instruction.

The court later gave a comprehensive four-page jury instruction to assist the jurors in their evaluation of eyewitness testimony, asking them to consider the witnesses' opportunity to identify given the lighting, distance, and familiarity with the subject identified, possible bias in testifying, possible memory problems, strength of earlier and later identifications, lapse of time between the event and the identification, and other factors contained in the excluded expert's report.

In *Rincon,* we held:

Even though the factors about which Dr. Pezdek was to testify may have been informative, the district court conveyed that same information by providing a comprehensive jury instruction to guide the jury's deliberations.

28 F.3d at 925. The same reasoning holds true for this case. In *United States v. Ginn,* 87 F.3d 367, 370 (9th Cir.1996), we held:

The district court could reasonably find that the most efficient method of attacking the credibility of the eyewitness testimony would be through cross-examination of the eyewitness.

The district court is not *required* to admit expert testimony every time a party is able to make the threshold *Daubert* showing. The district court may exercise its discretion to exclude expert testimony if it finds that the testimony would waste time, confuse or not materially assist the trier of fact, or be better served through cross-examination or a comprehensive jury instruction. The district court in this case did not abuse its discretion by excluding the defendant's proffered expert and charging the jury with a comprehensive instruction on the evaluation of eyewitness testimony.

#### E. *The Commerce Clause*

Hicks argues on appeal that Congress exceeded its power under the Commerce Clause in enacting 18 U.S.C. § 2119, the federal carjacking statute. The constitutionality of a statute is a question of law that we review *de novo. United States v. Sahhar,* 56 F.3d 1026, 1028 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 400, 133 L.Ed.2d 320 (1995); *United States v. Alexan-*

*der*, 48 F.3d 1477, 1491 (9th Cir.), *cert. denied*, ⸺ U.S. ⸺, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

■■■ This issue is foreclosed by circuit precedent. Under *United States v. Lopez*, ⸺ U.S. ⸺, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), whether a statute regulating intrastate activity is within the Commerce power depends on whether the regulated activity substantially affects interstate commerce. We have found 18 U.S.C. § 2119 constitutional under the *Lopez* standard. *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir.1995). This decision was recently reaffirmed by *United States v. Randolph*, 93 F.3d 656 (9th Cir.1996).[12] Congress did not exceed its Commerce Clause authority in enacting this statute.

#### F. The Life Sentence

■■■ Hicks challenges the district court's decision to impose a life sentence following conviction on all three counts charged. The district court's interpretation and application of the sentencing guidelines are reviewed *de novo*. *United States v. Basinger*, 60 F.3d 1400, 1409 (9th Cir.1995); *United States v. Oliver*, 60 F.3d 547, 554 (9th Cir.1995). We conclude that the life sentence was lawfully imposed by the district court.

■■■ The district court sentenced Hicks on the basis of the sentencing guidelines for the charge of being an armed career criminal and found that the gun was "used to initiate the events in question."[13] The court concluded that the killing was committed with malice aforethought, that Hicks was responsible for Harrington's reasonably foreseeable acts, and that the events also constituted felony murder. The federal murder statute, 18 U.S.C. § 1111(a), includes the felony-murder doctrine and the unlawful killing of another "committed in the perpetuation of ... kidnaping, ... aggravated sexual abuse ...

or robbery." The intent requirement for felony murder is the intent to commit the underlying dangerous felony, not intent to commit murder. *United States v. Chischilly*, 30 F.3d at 1159.

The district court correctly applied § 2K2.1(c)(1) of the sentencing guidelines, which provides:

> If the defendant used or possessed any firearm ... in connection with the commission ... of another offense, ... apply[,] ... if death resulted, the most analogous offense guidelines from Chapter Two, Part A, Subpart 1 (Homicide).

The homicide guideline for murder, § 2A1.1, provided an offense level of 43 with a guideline range of life imprisonment. Therefore, the district court properly imposed a sentence of life imprisonment for the charge of being an armed career criminal.

The district court could have reached the same result had it chose to sentence Hicks on the basis of the carjacking charge. There was no guideline for carjacking on the date of the offense. Where no guideline exists for the specific offense, the guidelines require the district court to use the most analogous guideline. U.S.S.G. § 2X5.1. In this case, the most analogous guideline for carjacking would have been § 2B3.1, the guideline for robbery. Subsection (c)(1) of § 2B3.1 states:

> If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the ... jurisdiction of the United States, apply § 2A1.1 (First Degree Murder).

Title 18 U.S.C. § 2119(3) allows the district court to impose a term of life imprisonment for carjacking "if death results." As we discussed above, the carjacking in this case continued until the three perpetrators dumped Kimberly along the side of the road. The killing occurred during the course of the

---

12. *Randolph* interpreted the amended version of 18 U.S.C. § 2119, enacted September 13, 1994. The Commerce Clause analysis does not change. *Randolph* correctly cited *Oliver* in upholding the amended version of the statute under the Commerce Clause.

13. The district court did not separately calculate a sentencing range for Hicks on the basis of the carjacking charge because the court found that the armed career criminal charge resulted in a life sentence, eliminating the need to calculate a sentence for the carjacking charge that would merge with the other charge in any event.

carjacking. Therefore, applying the felony murder statute, the district court could have sentenced Hicks to a term of life imprisonment on the basis of the carjacking charge as well.

Applying the sentencing guidelines to either the armed career criminal conviction or the carjacking conviction, the district court lawfully imposed a life sentence on Hicks.

## III. CONCLUSION

After carefully reviewing all of the arguments advanced by the defendant on this appeal, we conclude that the district court committed no reversible error. Therefore, the defendant's conviction and sentence are AFFIRMED.

AFFIRMED.