GREGORY D. BOLIN, APPELLANT, *v*. THE
STATE OF NEVADA, RESPONDENT.

No. 29497

May 19, 1998                                    960 P.2d 784

[Rehearing denied August 27, 1998]

*Patricia M. Erickson*, Las Vegas, for Appellant.

*Frankie Sue Del Papa*, Attorney General, Carson City; *Stewart
L. Bell*, District Attorney, *James Tufteland*, Chief Deputy Dis-
trict Attorney, *Gary Guymon*, Deputy District Attorney, Clark
County, for Respondent.

## OPINION

By the Court, ROSE, J.:

Appellant Gregory Bolin was convicted of first degree kidnapping, sexual assault, and first degree murder and sentenced to death. Bolin now appeals his conviction and sentence, arguing that: (1) the district court erred in admitting evidence of his prior rape and kidnapping convictions, (2) the admission of a witness's one-on-one jailhouse identification deprived him of a fair trial, (3) the district court erred in admitting serology evidence because the search warrant used to obtain such evidence was invalid, (4) the district court erred in admitting hair analysis evidence and statistical DNA evidence, (5) the district court erred in denying Bolin's objections to certain jury instructions, (6) the aggravating circumstance embodied in NRS 200.033(4) is unconstitutional, (7) the district court erred by not making a habitual criminal determination and sentencing Bolin on the sexual assault and kidnapping convictions prior to the penalty phase, and (8) the district court abused its discretion by allowing victim impact testimony. For the reasons set forth below, we reject Bolin's contentions and affirm his conviction and sentence.

### FACTS

On July 15, 1995, the body of Brooklyn Ricks (Ricks) was discovered at a residential construction site in Las Vegas. Up until the time of her death, Ricks and her husband, Kerry, shared

an apartment with Ricks' two sisters, Liberty and Brittany. Additionally, Ricks and her sisters worked at B&R Video—a video rental store—which was located a short distance from their Las Vegas apartment in a nearby strip mall.

During the first week of July 1995, Ricks' sister, Liberty, opened a video rental account for Bolin at B&R Video. Thereafter, Bolin returned to the store approximately every other day, and on each occasion he asked Liberty on a date. Although Bolin was persistent, Liberty declined each invitation. In addition to his interest in Liberty, Bolin also asked Brittany on a date and asked Liberty whether Ricks would be interested in going on a date with him. As with Liberty, neither Brittany nor Ricks agreed to date Bolin.

On July 14, 1995, Liberty was scheduled to work from 3:00 p.m. until midnight at B&R Video. Because of a prior commitment that prevented her from working her entire shift, Ricks agreed to go into work at 10:00 p.m. to complete Liberty's shift. At 9:45 p.m., Ricks left her home in her 1974 gray Chevrolet pickup truck. At approximately 9:50 p.m., Bolin entered B&R Video wearing a tight black tank top, light-colored shorts, and white tennis shoes. Bolin's arrival and appearance were depicted on B&R Video's surveillance camera. At approximately 10:00 p.m., Ricks arrived at B&R Video wearing a turquoise B&R Video polo shirt and blue jeans. Additionally, Ricks was carrying a black backpack and was wearing her wedding band, an opal ring, and a gold bracelet.

Shortly after 10:00 p.m., Liberty left B&R Video. Bolin exited the store at the same time and walked towards the adjacent Albertson's grocery store. At approximately 12:10 a.m., Ricks and co-worker Tabitha Wharton departed B&R Video after completing routine closing procedures. Wharton watched as Ricks got into her vehicle and drove past the Albertson's grocery store towards Jones Boulevard. Wharton was the last person to see Ricks alive.

The following morning, carpenter Keith Sirvaag discovered Ricks' body at a residential construction site in Las Vegas when he arrived for work at approximately 5:30 a.m. Upon arriving at the construction site, Sirvaag noticed a gray, 1970's model Chevrolet or GMC pickup truck parked along the right side of the dirt road leading into the project. After passing the truck, Sirvaag continued a short distance further until he arrived in front of one of the framed houses that he would be working on that day. While sitting in his truck approximately forty feet from the house, Sirvaag noticed an African-American male inside the framed house near the staircase. Sirvaag continued to watch as the man walked through the house and exited through the garage.

After exiting the garage, the man walked in front of Sirvaag's truck at a distance of approximately twenty feet, and was in his field of vision for approximately twenty to thirty seconds. As the man approached Sirvaag's truck, Sirvaag noticed that he was wearing a dark tank top and light-colored dress shorts. Sirvaag estimated that the man was approximately thirty years old, six feet tall, and weighed about 220 to 230 pounds.[1] In addition to having a very muscular build, Sirvaag noticed that the man had a tattoo located on his upper right arm. However, Sirvaag did not get a good view of the tattoo's shape or form.

After the man walked past Sirvaag's truck, Sirvaag glanced back to the framed house from where the man had departed and noticed something under the staircase. Approximately five to ten seconds later, Sirvaag looked in his rearview mirror and saw the gray pickup truck depart the construction site in a rapid and erratic manner. It appeared to Sirvaag that the same African-American male who he had seen exit the house was driving the gray pickup truck.

Upon exiting his truck to begin work, Sirvaag heard a gagging noise emanating from the framed house in which he had seen the African-American male. After hearing the noise several more times, Sirvaag proceeded around the back of the house to investigate. Upon entering the house through a rear doorway, Sirvaag noticed the body of a young woman lying under the staircase.

Sirvaag approached the woman, who was still alive but unconscious, and noticed that she had a gag in her mouth, her hands were tied behind her back, and her face and chest were covered in blood. While the woman was unresponsive to his questions, Sirvaag nonetheless told her to "hang on" and that he was "going to run and get help." Sirvaag then ran to one of the occupied homes in the construction site and called the police and emergency medical personnel, who arrived at the scene within a matter of minutes. By the time Sirvaag returned to the house to render assistance, the woman had died.

At approximately 7:00 a.m., Det. Morgan, of the Las Vegas Metropolitan Police Department (LVMPD), conducted a twenty minute taped conversation with Sirvaag at the crime scene wherein Sirvaag relayed the description of the suspect. At approximately 8:15 a.m., James Becvar, an investigator with the Clark County Coroner's Office, arrived at the crime scene. In conducting his initial examination of the victim's body, Becvar observed that the woman was wearing blue jeans and a turquoise polo shirt with a B&R Video logo. Becvar observed that the

---

[1]Bolin's actual height is 5'9" and his approximate weight is 200 pounds.

victim had sustained several puncture wounds to her chest and left breast.

After examining the victim's chest wounds, Becvar unbuttoned the victim's jeans in order to perform a preliminary sexual assault examination. Without removing the victim's jeans or underwear, Becvar observed that the woman's underwear had been turned inside out. Additionally, a used sanitary napkin was found next to the victim's body. After Becvar's initial examination, the woman's body was transported to the Clark County morgue for identification.

Based on the B&R logo on the woman's shirt, detectives from LVMPD and Becvar proceeded to B&R Video and learned that the victim found at the construction site matched the physical description of Ricks, who had been missing since the previous evening. With this information, Becvar proceeded to Ricks' apartment to confirm the victim's identity. Based on photos and a physical description of Ricks provided by her husband, Becvar made the preliminary conclusion that the victim at the construction site was indeed Ricks.

Knowing that Ricks was last seen alive at work, Becvar asked Ricks' two sisters if anything strange had occurred at B&R Video during the previous few weeks. Ricks' sisters informed Becvar that a man had recently been frequenting the video store and had persistently asked them on dates. Based on the physical description of the man provided by Ricks' sisters, Becvar thought that this individual could be the same man that Sirvaag had seen at the crime scene shortly before Ricks' death. Additionally, Ricks' sister, Liberty, told Becvar that the man had been at the video store the previous evening around 10:00 p.m. and that his appearance was most likely depicted on B&R Video's surveillance camera.

Based on this information, Det. Morgan proceeded to B&R Video at approximately 11:00 a.m., took possession of the surveillance video from the previous night, and then proceeded to Ricks' apartment to interview her family members and inspect the video. On the video, a clean-shaven, muscular, African-American male wearing a black tank top, light-colored shorts, and white tennis shoes entered B&R Video at approximately 9:50 p.m. on the night Ricks was last seen alive. After watching the video, Det. Morgan concluded that the African-American male on the tape matched Sirvaag's description of the man he had seen at the construction site. Through his interview with Ricks' sister, Liberty, Det. Morgan learned that the man on the surveillance video was named Gregory Bolin and that he had recently opened a video rental account at B&R Video.

At approximately 12:30 p.m., Dets. Morgan and Tremel proceeded to the address listed on Bolin's B&R Video rental account, which was located only a few minutes from B&R Video. Bolin's father told them that the previous evening Bolin had left the house between 9:00 and 10:00 p.m. and returned home at approximately 4:45 or 5:00 a.m. the next morning. Dets. Morgan and Tremel then conducted a taped interview with Bolin at the Bolin residence.

During the interview, Bolin stated that he had stopped by B&R Video at approximately 10:00 p.m., left shortly afterwards for the nearby Albertson's to purchase beer and doughnuts, and then walked to a park where he met two individuals named ''Ronny'' and ''Robert.'' Bolin added that the three of them then went to a party and that he returned home from this party at dawn.

When questioned by Det. Morgan, Bolin was unable to provide either the last names of ''Robert'' or ''Ronny'' or the location of the party. Additionally, while Det. Morgan knew from his viewing of the B&R Video surveillance tape that Bolin had been dressed in a black tank top, light-colored shorts, and white tennis shoes, Bolin stated that on the evening in question, he was dressed in brown shorts, a white T-shirt, and brown sandals. Further, in response to a question from Det. Morgan, Bolin stated that he had never been previously arrested. Later that day, Ricks' gray 1974 Chevrolet pickup truck was found approximately five blocks from Bolin's home with a bloody screwdriver inside.

After concluding the taped interview with Bolin, Det. Morgan and a deputy district attorney began preparing an affidavit and search warrant to search Bolin's residence. In his affidavit, Det. Morgan listed the items he hoped to obtain at Bolin's residence, including the clothing that Bolin was seen wearing on the B&R Video surveillance tape, Ricks' wedding ring and her black backpack, the keys to her gray pickup truck, and Bolin's photograph and fingerprints. Additionally, Det. Morgan sought permission to administer a serology kit in order to obtain samples of Bolin's blood, saliva, and hair for forensic testing. The search warrant was signed later that day by a district court judge.

After Ricks' body was positively identified, Dr. Jordan, an assistant medical examiner with the Clark County Coroner's Office, performed an autopsy. In performing the autopsy, Dr. Jordan observed that Ricks had suffered multiple blunt traumas to the head, neck, and extremities, along with approximately twelve puncture wounds to her left chest and back. Additionally, Dr. Jordan observed that Ricks' jaw had been broken. Dr. Jordan concluded that the blunt trauma wounds to Ricks' head and body were consistent with being struck with a piece of lumber and her puncture wounds were consistent with being stabbed with a

screwdriver. Dr. Jordan concluded that Ricks died as a result of numerous stab wounds to the chest, some of which penetrated her left lung, and blunt trauma to the head. Dr. Jordan also performed a sexual assault examination, during which he concluded that there were no signs of anal or vaginal trauma.

On July 16, 1995, Dets. Morgan and Tremel, along with Sgt. Hefner and two uniformed police officers, executed the search warrant at Bolin's residence. While searching Bolin's bedroom, Det. Morgan found a light-colored pair of shorts and a blue tank top in Bolin's closet. A pair of brown sandals belonging to Bolin were found downstairs near the garage. Although Bolin had previously told Det. Morgan that he had never been arrested, Det. Tremel found a Colorado prison inmate identification card in Bolin's room bearing Bolin's name and picture.

During the search, Bolin denied owning a black tank top. However, while searching the laundry room, Det. Tremel found a black tank top which belonged to Bolin. Although the police thoroughly searched Bolin's bedroom, the garage, and the other rooms to which Bolin had access, they did not find the white tennis shoes that Bolin was seen wearing on the B&R Video surveillance tape. Additionally, the police were unable to find any of Ricks' possessions.

At the conclusion of their search, Dets. Morgan and Tremel escorted Bolin to the Clark County Detention Center (detention center) to take his photographs and fingerprints and administer a serology kit. When drawing Bolin's blood for laboratory analysis, Det. Tremel mistakenly used a DUI kit instead of the proper serological kit. Additionally, Det. Morgan arranged to have Sirvaag conduct a walk-through identification session at the detention center during the time that Bolin would be present.

While Dets. Morgan and Tremel were executing the search warrant at Bolin's residence, Sirvaag arrived at the detention center to prepare for his walk-through identification session. Sgt. Hefner conducted an interview with Sirvaag and informed him that some of the inmates had been dressed in police uniforms and some undercover police officers had been placed in the holding cells in order to test Sirvaag's memory. Additionally, Sirvaag drew two pictures of the tattoo he saw on the right arm of the man at the construction site.

After conducting the interview, Sgt. Hefner escorted Sirvaag through the detention center. During the identification procedure, Sirvaag observed six holding cells containing approximately seventy inmates of various races in each cell. Additionally, Sirvaag observed numerous people in the detention center's booking area. After approximately fifteen minutes, Sirvaag proceeded to the detention center's main entrance area where Bolin, who was

dressed in casual attire, had just entered. Because Sirvaag knew that Dets. Morgan and Tremel were conducting the investigation into Ricks' death, they entered the detention center separately from Bolin to ensure that Sirvaag would not be improperly influenced in his attempts to identify a suspect.

After observing Bolin for several minutes, Sirvaag informed Sgt. Hefner that due to Bolin's clean-shaven facial appearance, his neatly trimmed hairstyle, and his rather large muscular build, Bolin resembled the man that he saw at the construction site. Dets. Morgan and Tremel then took Bolin approximately twenty feet down an adjacent hallway for photographing and fingerprinting. As Bolin was being photographed, Sirvaag observed him with his shirt off, at a distance of approximately twenty feet, for about five to ten minutes. Because of the presence of a tattoo on Bolin's upper right arm near his bicep, Sirvaag became more convinced that Bolin was the man that he had seen at the construction site.

Although he identified many similarities between Bolin and the man he saw at the construction site, Sirvaag told Sgt. Hefner that he was not completely certain that Bolin was the same man. After completing the walk-through identification session, Sirvaag departed the detention center at approximately 12:30 p.m. However, approximately one hour after his departure, Sirvaag telephoned Sgt. Hefner and stated that he was ninety percent sure that the man he saw at the detention center was the same person he saw leaving the crime scene.

On July 17, 1995, LVMPD criminalist Terry Cook analyzed the serological evidence obtained from Bolin, along with the vaginal swabs taken from Ricks' body. His analysis of the vaginal swabs detected a trace amount of semen protein P30. Additionally, Cook determined that Ricks had been menstruating at the time of her death because the vaginal swabs taken from her body were bloody.

Based on his knowledge and expertise, Cook knew that semen would not remain in the vaginal cavity of a menstruating woman for more than three days. Consequently, Cook concluded that the semen contained on the vaginal swabs taken from Ricks' body had to have been deposited within a matter of hours, or at the very latest, within three days of her death.[2] However, because of the small quantity of semen obtained, Cook determined that the specimen had little evidentiary value and could not be used to identify its donor.

---

[2]Because Ricks had been menstruating, her husband testified that they had not had sexual intercourse for eight days prior to her death.

In addition to his analysis of the vaginal swabs, Cook analyzed the pubic hair samples obtained from Ricks' pubic combings. While performing this process, Cook identified what appeared to be a foreign pubic strand. To conclusively establish whether the strand was foreign, Cook microscopically analyzed known samples of Ricks' pubic hair in order to establish a range of comparison and then compared Ricks' pubic hair samples with the apparent foreign pubic hair strand. Cook concluded that the lone pubic strand was indeed foreign and dissimilar.

In his attempt to compare the foreign pubic hair sample with Bolin's pubic hair sample and to conduct DNA analysis on Bolin's hair and blood samples, Cook discovered that Det. Tremel had mistakenly used a DUI kit instead of the proper serological kit. Consequently, Cook informed Det. Tremel of the mistake and stated that he needed a second serology kit administered to Bolin in order to conduct scientific testing.

Because of the mistake, Sgt. Hefner contacted the district attorney's office to determine the necessary procedural steps in order to seize a second set of serological samples from Bolin. A representative of the district attorney's office informed Sgt. Hefner that the search warrant that was issued on July 15, 1995 was still valid, and thus a second warrant was not needed to obtain a second serology kit from Bolin.

Based on this information, Det. Tremel obtained a second serology kit from Bolin on July 18, 1995. During this procedure, samples of Bolin's blood, saliva, and head and pubic hair were seized. Using evidence obtained in the second serology kit submitted by Det. Tremel on July 18, 1995, Cook determined that the foreign pubic hair recovered from Ricks' body was microscopically similar to the pubic hair strand obtained from Bolin.

On July 18, 1995, Bolin was arrested and charged with Ricks' murder. In the criminal complaint, Bolin was charged with one count each of first degree kidnapping with use of a deadly weapon, sexual assault with use of a deadly weapon, and murder with use of a deadly weapon. On September 26, 1995, the State filed an information charging Bolin with the same crimes, indicating its notice of intent to seek the death penalty. To support its intent to seek the death penalty, the State listed five aggravators, including that the murder was committed by a person under sentence of imprisonment; the murder was committed by a convicted violent felon; the murder was committed while the perpetrator was engaged in the commission of a first degree kidnapping and/or sexual assault; the murder was committed to avoid or prevent a lawful arrest; and the murder involved torture, depravity of mind or the mutilation of the victim.

On October 4, 1995, Bolin pleaded not guilty to all counts and waived his speedy trial rights. On May 30, 1996, the State filed an amended information charging Bolin with Count I, first degree kidnapping; Count II, sexual assault; and Count III, murder (open), and excluding the deadly weapon enhancement.

Because the State sought to introduce evidence of Bolin's prior criminal history at trial in order to demonstrate intent and motive, a *Petrocelli* hearing was conducted on June 3, 1996. During this hearing, evidence of Bolin's prior criminal history, which consisted of a 1975 Colorado kidnapping and sexual assault for which Bolin had served nearly twenty years in prison, was established through the testimony of the victims of these past crimes.

At Bolin's *Petrocelli* hearing, Renee Morriss (Morriss) testified that on April 15, 1975, she and her then husband John, were both Army nurses stationed in Aurora, Colorado. After finishing their shift at approximately 11:00 p.m., the couple drove home together and exited their car at the parking spot in front of their apartment. Two young males came out of the bushes, one holding a .22 handgun, and told them to get back into the car. The older looking male, who was approximately nineteen years old and who was later identified as Bolin, ordered John to drive or he would shoot Morriss.

Immediately upon driving off, Bolin demanded money from the couple. While they did not have any cash in their possession, John gave Bolin his wallet and watch, and Morriss handed over her wedding ring. After driving approximately thirty minutes, Bolin forced John to stop the car in a dark and secluded area and then forced him into the trunk of the car at gunpoint.

During the next six hours, Bolin and his accomplice brutally raped Morriss on several occasions at gunpoint. Additionally, at one point in the evening, Bolin forced Morriss to drive to her apartment so that Bolin and his accomplice could rob her and John of their valuables. Morriss and John were eventually able to escape when Bolin forced her to drive to a convenience store and cash a check for one hundred dollars. While Bolin and his accomplice were occupied in the store, Morriss ran back to her vehicle, drove off, and contacted the police.

Bolin was eventually apprehended and pleaded guilty to two counts of first degree kidnapping and two counts of rape. Bolin spent the next thirteen years in a Colorado prison before being paroled in July 1988. In February 1990, Bolin's parole was revoked, and he consequently went back to prison for an additional five years. Bolin was finally released from the Colorado prison system on June 29, 1995, approximately two weeks prior to Ricks' murder.

At the conclusion of the *Petrocelli* hearing, the district court concluded that evidence of Bolin's prior bad act was relevant to the crime charged, that it had been proven by clear and convincing evidence, and that its probative value was not substantially outweighed by the danger of unfair prejudice. Consequently, the district court concluded that evidence of Bolin's prior bad acts were admissible at trial pursuant to NRS 48.045(2) to demonstrate identity, plan, intent, similar modus operandi, and sexual aberration.

Bolin's trial commenced on June 10, 1996. During trial, the district court admitted evidence of Bolin's 1975 rape and kidnapping convictions over Bolin's objections. Additionally, LVMPD criminalist Cook testified that the foreign pubic hair found in Ricks' pubic hair combings was microscopically similar to Bolin's pubic hair sample and concluded that Bolin could not be excluded as the source of the foreign pubic strand.

In order to further narrow the number of possible individuals who could have been the donor of the foreign pubic hair, the hair was analyzed by a molecular biologist with Cellmark Diagnostics. The biologist testified that because of the size of the hair and the amount of DNA available for testing, she was only able to perform a PCR[3] test instead of the more narrowing RFLP[4] test. She concluded that one out of every 2600 African-Americans would have hair root DNA similar to both the DNA found in Bolin's hair and the DNA found in the foreign pubic hair found on Ricks' body.

Additionally, Bolin's expert witness, Lisa Marie Calandro, a forensic scientist with Forensic Analytical Specialties, testified that PCR analysis was reliable for exclusionary purposes. Calandro testified that she analyzed the DNA of Bolin and compared it to the DNA found in the foreign pubic hair that was found in Ricks' pubic hair combings. Calandro concluded that the

---

[3]PCR stands for "Polymerase Chain Reaction." *See* U.S. v. Hicks, 103 F.3d 837 (9th Cir. 1996). The PCR technique involves three basic phases: "First, a fragment of DNA is extracted from a sample of evidence. Second, during the amplification phase, millions of copies of the fragment are created by mixing the sample with enzymes, chemicals, and primers. Third, the finished product is tested for comparison with a known DNA sample from a victim or suspect." *Hicks,* 103 F.3d at 845. Unlike the RFLP procedure, which is a much more accurate test used to establish a statistical match, the PCR technique is generally used as an exculpatory tool to "exclude certain individuals as possible contributors to a particular sample." *Id.*

[4]RFLP, which is the most widely used DNA analysis technique, stands for "Restriction Fragment Length Polymorphism." *See* Armstead v. State, 673 A.2d 221, 228 (Md. 1996). In this test, the biologist examines the differences in sizes of fragments of DNA from one person to another and narrows the sample DNA to one particular individual. For a more thorough explanation of the RFLP procedure, *see Armstead,* 673 A.2d at 228.

DNA found in Bolin's pubic hair sample and the foreign pubic hair found on Ricks' body could be found in only one in 2400 African-Americans.

After obtaining the foregoing DNA statistical probability evidence, the State analyzed the evidence by applying census statistics taken from the Las Vegas area. According to the Clark County Department of Comprehensive Planning, the population of Clark County in July 1995 was approximately 1,040,688 people. Out of this number, there were approximately 98,865 African-Americans, of which approximately 21,111 were African-American males between the ages of 20-44.

Bolin's expert witness, Dr. Thomas Carroll, a professor of economics specializing in demographics, proffered slightly different statistical figures. Dr. Carroll testified that based on a figure of 1,468,000 people in Clark County in 1995, 110,000 individuals were African-American and from this number, there were approximately 21,682 African-American males between the ages of 20-44.

Based on the DNA statistical probability evidence combined with the 1995 Clark County census calculations, the State argued during closing argument that Bolin was one of approximately nine individuals that could have committed Ricks' murder. The State obtained this figure by dividing the number of 20-44 year-old African-American males in Clark County in 1995 (approximately 22,000) by 2600 or 2400 (the figures which the parties obtained from the DNA statistical probability evidence), resulting in a class of approximately nine individuals, of which Bolin was a member, who could have been the donor of the foreign pubic strand found in Ricks' pubic hair combings.

On July 15, 1996, the jury returned a verdict finding Bolin guilty of first degree kidnapping, sexual assault, and first degree murder. During the penalty phase, Ricks' husband, mother, and father were allowed to give victim impact testimony. At the conclusion of the penalty phase, the jury found the following aggravators: that the murder was committed by a person previously convicted of felonies involving violence, that the murder was committed while the person was engaged in the commission of or an attempt to commit any first degree kidnapping and/or sexual assault, and that the murder involved torture or depravity of mind or mutilation of the victim. The jury found no mitigating circumstances. After concluding that the aggravating circumstances outweighed any mitigating circumstances, the jury sentenced Bolin to death.

On August 21, 1996, the State filed its notice of intent to seek punishment as a habitual criminal. On September 30, 1996, the court entered its judgment and imposition of sentence by adjudg-

ing Bolin guilty of first degree kidnapping, sexual assault, and murder in the first degree. Additionally, the court adjudged Bolin a habitual criminal under Counts I and II and sentenced him to life without the possibility of parole on both counts, with the terms to run consecutively. Thereafter, the court signed the order and warrant of execution in open court and granted Bolin's oral stay of execution. On October 29, 1996, Bolin filed a timely notice of appeal. Bolin now appeals his conviction and sentence of death.

## DISCUSSION

### Guilt Phase

#### The district court did not err in admitting evidence of Bolin's prior rape and kidnapping convictions

As previously indicated, the district court concluded that evidence pertaining to Bolin's 1975 Colorado rape and kidnapping convictions was admissible to demonstrate identity, plan, similar modus operandi, and intent pursuant to NRS 48.045(2). The district court further concluded that evidence of Bolin's prior bad act was admissible pursuant to the limited sexual aberration exception to NRS 48.045 set forth in Findley v. State, 94 Nev. 212, 577 P.2d 867 (1978), and McMichael v. State, 94 Nev. 184, 577 P.2d 398 (1978), *overruled on other grounds by* Meador v. State, 101 Nev. 765, 711 P.2d 852 (1985).

NRS 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have established the following three prerequisites to the introduction of other bad acts: "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." Walker v. State, 112 Nev. 819, 824, 921 P.2d 923, 926 (1996). *See also* NRS 48.035. Further, evidence of prior criminal behavior may be admitted to prove identity "when that prior behavior demonstrates characteristics of conduct which are unique and common to both the defendant and the perpetrator whose identity is in question." Coty v. State, 97 Nev. 243, 244, 627 P.2d 407, 408 (1981). The trial court's determination will not be overturned

absent manifest error. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 505, 508 (1985).

Bolin argues that the district court erred in admitting evidence of his prior rape and kidnapping convictions because the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. Further, Bolin argues that there were no unique similarities or common characteristics of conduct between his 1975 rape and kidnapping convictions and Ricks' murder which justified the admission of his prior bad acts. Consequently, Bolin argues that the district court's admission of such evidence constituted manifest error. In making this argument, Bolin relies primarily on our decision in Meek v. State, 112 Nev. 1288, 930 P.2d 1104 (1996).

In *Meek,* we acknowledged that statements that the defendant made to the victim of the crime for which he was convicted and the victim of an alleged prior bad act were similar, but we explained that evidence of the prior bad act had been improperly admitted because

> the prior act and the charged crime were otherwise fundamentally quite different. The meeting by happenstance is too general a similarity to deserve much weight, if any. The similarity of the sexual element in both cases is also quite general. Stated broadly enough, similarities can be shown between many acts. The question is whether significant similarities remain after the acts are considered in some detail. In the charged crime, Meek met a woman on a bus in the morning, persuaded her to join him at his home, and allegedly took advantage of her trust and sexually assaulted her. He was accused of using intimidation, but not violence. In the alleged prior bad act, Meek followed a woman late at night by stealth to her home, kidnapped her in her own car, subjected her to direct and brutal violence, threatened to have sex and kill her, drove with her aimlessly for a time, and then returned to her home. In view of the differences between these acts, the similarities between them are insufficient to make the prior act relevant to the charged crime.

*Id.* at 1294, 930 P.2d at 1108.

Relying on *Meek,* Bolin asserts that there were dissimilarities between his prior rape and kidnapping convictions and Ricks' murder which rendered evidence of his prior bad acts inadmissible. Bolin argues that in the Colorado case, Morriss and her husband were confronted by Bolin and his accomplice, whereas in the instant case, there is no evidence indicating whether Ricks' murderer acted alone or with an accomplice. Further, Bolin used a gun in the Colorado case. In the instant case, Ricks was stabbed to death, and there was no evidence that a gun was involved.

Additionally, unlike his 1975 prior bad acts, Bolin argues that the only evidence indicating that Ricks had been sexually assaulted was the finding of one foreign pubic hair in her pubic hair combings and the finding of a minute amount of semen in the vaginal swabs taken from her body. However, in the Colorado case, Bolin subjected Morriss to digital penetration, fellatio, and sexual intercourse. Lastly, Bolin argues that Ricks suffered severe injuries including stab wounds to the chest and blunt trauma injury to the head. In the Colorado case, Bolin argues that he did not inflict injuries of similar severity upon Morriss.

Based on the foregoing, Bolin argues that his prior bad acts were dissimilar to the crime for which he was charged and thus inadmissible. We disagree. First, we reject Bolin's arguments that the evidence was insufficient to show that the acts committed against Ricks included robbery and sexual assault. On the contrary, the evidence established these similarities with the 1975 prior bad acts. We also note that although in 1975 Morriss did not suffer lethal injuries, her treatment was brutal, and she escaped before Bolin could inflict further harm upon her.

In Nester v. State of Nevada, 75 Nev. 41, 334 P.2d 524 (1959), the defendant was charged with raping a woman in her North Las Vegas home. Evidence adduced at trial indicated that during the commission of the crime, the assailant hit the woman in the face and told her to "shut up or I'll knock you out." *Id.* at 43, 334 P.2d at 525. The perpetrator then completed the act of sexual assault without removing any of the woman's undergarments or his own clothing. *Id.* During their inspection of the victim's home, the police determined that the perpetrator had unscrewed the fuses from the fuse box to prevent the victim from turning on her lights. *Id.*

During trial, the State presented evidence of a subsequent rape by the defendant for the limited purpose of establishing the defendant's identity. The victim in the subsequent rape testified that after she had driven approximately one block from her North Las Vegas apartment, a man rose up from the back seat, placed his hands on her shoulders, and told her to keep driving. *Id.* at 44, 334 P.2d at 526. A short while later, the man directed her to stop by the side of the road and then jumped into the front seat and told her "shut up or I'll knock you cold." *Id.* at 44-45, 334 P.2d at 526.

Without removing any of his or her clothing, the assailant sexually assaulted the woman. *Id.* at 45, 334 P.2d at 526. After being released, the woman returned to her apartment and called the police. During their investigation, the police discovered the victim's front door light and the floodlight in her courtyard had been unscrewed. *Id.* at 45, 334 P.2d at 526.

On appeal, the State argued that evidence of the subsequent sexual assault had been properly admitted to establish identity because the two crimes were sufficiently similar. *Id.* at 48, 334 P.2d at 527-28. In concluding that the district court did not err in admitting evidence of the subsequent sexual assault, we held:

> While we are not willing to agree that all of the said elements of contended similarities are of material or of any significance, we do believe that there was sufficient evidence of similar characteristics of conduct between the assailant in each instance when faced with a like situation, to identify them as one and the same person.

*Id.* at 55-56, 334 P.2d at 531-32.

Similarly, in Canada v. State, 104 Nev. 288, 290, 756 P.2d 552, 553 (1988), the defendants were accused of committing the armed robberies of two bars. During one defendant's separate trial for one of the armed robberies, the district court admitted evidence of the other robbery for the limited purpose of establishing the defendant's identity pursuant to NRS 48.045(2). *Id.* at 292, 756 P.2d at 553. In each robbery, an individual had entered the bar, "cased it," and then returned with more individuals to commit " 'a brutal, straightforward armed robbery.' " *Id.* at 293, 756 P.2d at 554.

On appeal, the defendant asserted that the district court erred in admitting evidence of the second armed robbery because there was nothing unique about the manner in which the two robberies were committed. In rejecting this argument, we held:

> This argument is singularly unconvincing. The many similarities between the two crimes make evidence of the second highly probative of the identities of the perpetrators of the first. These similarities include the following: both robberies took place in deserted bars very late at night; in both robberies one of the perpetrators first entered alone and ordered a beer in order to case the bar; in both robberies at least one of the perpetrators wore a mask; and in both robberies the perpetrators were armed with shotguns. Finally, the *modus operandi* common to the two robberies was unique in comparison with other robberies in the manner in which the perpetrators savaged their victims. We conclude that the difficulty in identifying the perpetrators coupled with the high degree of similarity between the crimes made the evidence of [the] other robbery more probative than prejudicial.

*Id.* at 293, 756 P.2d at 554-55.

Here, as in *Nester* and *Canada,* we conclude that there were sufficient similarities between Bolin's 1975 rape and kidnapping

convictions and Ricks' murder to warrant admission of Bolin's prior bad acts for the limited purpose of establishing identity. In 1975, Bolin abducted Morriss at approximately 11:00 p.m. after she finished a late-night shift and drove home, and she escaped at approximately 5:00 a.m. the next morning. In the instant case, the perpetrator abducted Ricks sometime after 12:10 a.m. after she finished a late-night shift and began to drive home, and Bolin was seen leaving her body at approximately 5:30 a.m. At the time of her abduction and rape, Morriss was a twenty-year-old slender white female with blond hair who was 5'5'' tall. Similarly, at the time of her abduction and murder, Ricks was a twenty-one-year-old slender white female with blond hair who was 5'7'' tall.

In perpetrating the 1975 rape and kidnapping, Bolin ambushed Morriss and her husband after they parked their car. In the instant case, evidence suggests that Ricks was similarly ambushed. In 1975, Bolin robbed his victim of her wedding ring and other valuables. In the instant case, Ricks' wedding ring and purse were taken from her person and never recovered. In 1975, Bolin used Morriss' car to secret her to various remote locations where he committed crimes against her inside and outside of the vehicle. In the instant case, Ricks' vehicle was seen by Sirvaag at the location where her body was found, and her vehicle was subsequently found approximately five blocks from Bolin's home with a bloody screwdriver inside which matched Ricks' blood type. In 1975, after using Morriss' vehicle to transport her to a remote location, Bolin subjected Morriss to repeated acts of brutal sexual assault, bruising her spine, legs, and back. In the instant case, after the perpetrator used Ricks' vehicle to transport her to a remote location, evidence indicates that she was sexually assaulted and repeatedly stabbed, her skull was crushed, and her jaw was broken.

An analysis of the similarities between these two crimes reveals a common identity. In both, young white women of similar age, complexion, and build were abducted in their vehicles late at night, their wedding rings and other valuables taken, and their vehicles used to secret them to remote locations where they were subjected to brutal sexual assaults. Because of the similarities between the two crimes, we conclude that the district court did not err in admitting evidence of Bolin's prior rape and kidnapping convictions for the purpose of establishing identity pursuant to NRS 48.045(2).[5]

---

[5]We limit our holding solely to the propriety of admitting evidence of Bolin's prior bad acts for the purpose of establishing identity pursuant to NRS 48.045(2). Consequently, we decline to address Bolin's arguments that his prior convictions were improperly admitted on other grounds such as intent, plan, similar modus operandi, or sexual aberration.

*The district court did not err in allowing the admission of the
one-on-one identification made by Sirvaag*

Bolin argues that the one-on-one identification made by Sirvaag at the detention center was unnecessarily suggestive and unreliable. Specifically, Bolin argues that Sirvaag's identification was unnecessarily suggestive because Bolin was the only muscular African-American male asked to remove his shirt during the identification procedure and because Sirvaag saw Bolin communicating with Dets. Morgan and Tremel, whom Sirvaag knew were conducting the Ricks' murder investigation. Additionally, Bolin argues that the State had an obligation to employ a less suggestive identification procedure, such as a photo or a physical line-up. Bolin further asserts that Sirvaag was an unreliable witness, as evidenced by Sirvaag's inability during trial to provide the jury with descriptions of Dets. Morgan and Tremel even though he had met with both detectives on numerous occasions.

The applicable test is whether, in light of the totality of the circumstances, the identification was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). In Bias v. State, 105 Nev. 869, 871, 784 P.2d 963, 964 (1989), we explained that the test enunciated by the Court in *Stovall* involved a two-fold inquiry: ''(1) whether the procedure is unnecessarily suggestive and (2) if so, whether, under all the circumstances, the identification is reliable despite an unnecessarily suggestive identification procedure.''

We conclude that the identification procedure employed by the LVMPD at the detention center was not unnecessarily suggestive. On the day of the identification procedure at the detention center, Bolin was escorted into the facility wearing normal, casual attire, accompanied by a uniformed officer whom Sirvaag had never met. While Sirvaag had observed well over one hundred individuals of various races in the detention center up to that point, Sirvaag indicated to Sgt. Hefner that Bolin bore a resemblance to the man he saw at the crime scene. Further, Sirvaag made his identification of Bolin without any prompting.

Although Sirvaag observed Dets. Morgan and Tremel question and photograph Bolin, this activity took place only after Sirvaag identified Bolin to Sgt. Hefner. Furthermore, Sirvaag provided a clear description of the man that he saw exit the framed house at the crime scene and that description was nearly identical to Bolin's appearance as depicted on the B&R Video surveillance tape. Sirvaag's inability to provide the jury with descriptions of

Dets. Morgan and Tremel, in light of the fact that Sirvaag was confronted by numerous detectives in a short amount of time after he became a witness to this crime, is not dispositive. Based on the foregoing, we conclude that the district court did not err in admitting evidence pertaining to Sirvaag's detention center identification of Bolin.

> *The district court did not err in allowing the admission of the serology evidence obtained from the searches and seizures executed upon Bolin on July 16, 1995, and July 18, 1995*

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, forbids unreasonable searches and seizures. U.S. Const. amend. IV. Because both searches and seizures must be conducted pursuant to a warrant, any intrusion found lacking such authorization is presumptively unreasonable, subject only to a few well-delineated and established exceptions. Centanni v. Eight Unknown Officers, 15 F.3d 587, 590 (6th Cir. 1994). In Schmerber v. California, 384 U.S. 757, 766-768 (1966), the United States Supreme Court recognized that intrusive procedures into the human body for the purpose of acquiring blood samples constituted searches within the ambit of the Fourth Amendment and were thus subject to its stringent probable cause requirements.

> 1. *The information contained in the affidavit for search warrant provided a substantial basis for a finding of probable cause*

Bolin argues Det. Morgan's July 15, 1995 affidavit for search warrant did not provide a sufficient basis for probable cause which would support the requested execution of a serology kit. While Det. Morgan's affidavit for search warrant indicated that a homicide had been committed, Bolin argues that there were no facts to substantiate that a sexual assault had occurred which justified the seizure of blood, saliva, and samples of Bolin's head and pubic hair.

In his application and affidavit for search warrant, Det. Morgan recounted Sirvaag's entire account of what transpired when Sirvaag arrived at the construction site on the morning of Ricks' murder. In addition to Sirvaag's account, Det. Morgan included the details of his interview with Bolin wherein Bolin could not substantiate his whereabouts on the night of July 14, and the fact that Bolin told police that on that night he was

dressed in a white T-shirt, brown shorts, and sandals, although this directly contradicted his appearance as depicted on the B&R Video surveillance camera. Further, because of the extensive amount of blood at the crime scene, Det. Morgan indicated a need to execute a serology kit on Bolin in order to determine whether any blood on the victim or other trace evidence found at the crime scene, such as hair, matched Bolin's.

In Wright v. State, 112 Nev. 391, 396, 916 P.2d 146, 149 (1996) (quoting Keesee v. State, 110 Nev. 997, 1002, 879 P.2d 63, 66 (1994)), we reiterated that on appeal, the proper standard of review is " 'whether the evidence viewed as a whole provided a substantial basis for the magistrate's finding of probable cause.' " Based on the totality of the evidence, we conclude that the information contained in the affidavit for search warrant provided a substantial basis for a finding of probable cause. Consequently, we conclude that the seizure of Bolin's blood, saliva, and hair samples was constitutionally valid.

> 2. *The recovery of serology evidence from Bolin on July 18, 1995, was a constitutionally valid search*

In relevant part, NRS 179.075(1) provides that "[t]he warrant may be executed and returned only within 10 days after its date." On July 15, 1995, the district court authorized the search of Bolin's residence and the execution of a serology kit on Bolin. On July 16, 1995, Dets. Morgan and Tremel served and executed the search warrant at Bolin's residence. On the same date, blood was drawn from Bolin; however, Det. Tremel mistakenly used a DUI kit instead of the proper serological kit. After a representative of the district attorney's office informed the police that the July 15, 1995 search warrant was still valid, Det. Tremel obtained a second serology kit from Bolin on July 18, 1995, during which additional samples of Bolin's blood and saliva, along with samples of his head and pubic hair, were seized.

Bolin argues that the State failed to properly obtain a search warrant for the recovery of the second serology kit from him on July 18, 1995. Further, because none of the exceptions necessary for a warrantless search applied, Bolin argues that the search was unconstitutional and, consequently, any evidence derived therefrom must be suppressed. In support of his argument, Bolin relies on Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), wherein police withdrew two samples of the defendant's blood, the first sample without a search warrant, but the second sample with a valid search warrant. The Ninth Circuit concluded that the police violated the Fourth Amendment by drawing the first blood sample from the defendant without a search warrant. *Id.* at 1137.

In response, the State argues that the second serology kit obtained from Bolin on July 18, 1995, constituted a valid search because it occurred within the ten-day time period provided by NRS 179.075. In further support for its argument, the State relies on our conclusion in Smithart v. State, 86 Nev. 925, 478 P.2d 576 (1970). In *Smithart,* the defendant argued that a search warrant was defective because it was not executed immediately after its issuance. *Id.* at 929, 478 P.2d at 579. We held that the warrant was valid because it was served within the ten-day statutory time limit prescribed by NRS 179.075(1). *Id.*

In the instant case, we conclude that Bolin's argument is belied by the plain language of NRS 179.075(1). Further, Bolin's reliance on *Barlow* is misplaced. Unlike the situation in that case, where police obtained the first sample of the defendant's blood without a search warrant, here, the serological kit executed on Bolin on July 16, 1995, was supported by a valid search warrant that had been signed by the district court the previous day. Accordingly, based on a plain reading of NRS 179.075 and our holding in *Smithart,* we conclude that the acquisition of the second serology kit from Bolin on July 18, 1995, was constitutionally valid because it was obtained within the ten-day statutory time period prescribed by NRS 179.075(1).

*The district court did not err in allowing the admission of testimony regarding the examination of Bolin's hair and testimony regarding the statistical probability of DNA evidence*

    1.   *The district court did not err in allowing testimony regarding the examination of Bolin's hair samples*

Bolin argues that Cook's testimony that Bolin's pubic hair was "microscopically similar" to the foreign pubic hair found in the pubic hair combings of Ricks was irrelevant and unreliable as scientific evidence. Bolin argues that Cook's conclusions were unreliable because the testing procedures Cook employed allegedly yielded a 30.4 percent error rate. Further, Bolin argues that Cook's findings were unreliable because he took no notes detailing his examination findings, which is contrary to the practice of other forensic experts who find note taking a necessary component to hair comparison analysis.

The determination of whether to admit evidence is within the sound discretion of the district court, and that determination will not be disturbed unless manifestly wrong. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). Further, "it is the jury's

function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses." McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

The reliability of hair comparison analysis was testified to by Cook and was even more firmly established by Bolin's own expert witness, who indicated that Bolin could not be eliminated as the source of the foreign pubic hair found in the pubic combings taken from Ricks' body. Based on the testimony of both witnesses, which established hair comparison analysis as a reliable exculpatory tool, we conclude that the district court's admission of such evidence was not manifestly wrong.

## 2. *The district court did not err in admitting DNA statistical probability evidence*

Bolin argues that the statistical probability calculations used to determine the significance of the DNA match were neither trustworthy nor reliable and thus should not have been admitted at trial. Specifically, Bolin argues that the DNA analysis in the instant case was flawed because the calculations employed by the various experts did not take into account population subgroupings.

In support of his argument that DNA statistical probability calculations must include population subgroupings for accuracy, Bolin relies on People v. Pizzaro, 12 Cal. Rptr. 2d 436, 452 (Ct. App. 1992), and Commonwealth v. Lanigan, 596 N.E.2d 311, 315-16 (Mass. 1992), wherein both courts concluded that because of the possibility of significant genetic subgroupings within the larger heterogenous Caucasian, African-American, and Hispanic populations, DNA statistical probability calculations that did not account for such population substructure were flawed.

In Armstead v. State, 673 A.2d 221 (Md. 1996), the Maryland Court of Appeals considered a similar challenge to the reliability of DNA statistical probability calculations. In *Armstead,* the court recognized the scientific debate that existed until 1992 concerning whether genetic substructures within the larger heterogenous populations could cause considerable DNA variations in those subpopulations. *Id.* at 237. However, the court indicated that by 1993, based on the publication of several prominent empirical studies, such debate had effectively ended because studies confirmed that

> [e]stimates of the likelihood of occurrence of a DNA profile using each of the major population group data bases (e.g. Caucasian and Black) provide a greater range of fre-

quencies than would estimates from subgroups of a major population category. *Comparisons across major population groups provide reasonable, reliable, and meaningful estimates of DNA profile frequencies without forensically significant consequences.*

*Id.* at 238 (quoting U.S. Dep't of Justice, VNTR Population Data: A Worldwide Study, 6 (1993)) (emphasis added). Additionally, the court noted that:

> Subdivision, either by ethnic group or by U.S. geographic region, within a major population group does not substantially affect forensic estimates of the likelihood of occurrence of a DNA profile . . . . Estimated frequencies among regional groups and several subgroups of a major population category are similar. . . . The most appropriate approach, therefore, is to estimate the likelihood of occurrence of a particular DNA profile in each major group. . . . [B]ased on empirical data, *there is no demonstrable need for employing alternative approaches . . . to derive statistical estimates. . . . [F]requency data from major population groups provide valid estimates of DNA profile frequencies without significant consequences for forensic inferences.*

*Id.* at 238-39 (quoting B. Budowle et al., *The Assessment of Frequency Estimates of Hae III-Generated VNTR Profiles in Various Reference Databases,* 39 J. Forensic Sci. 319, 349 (1994)) (emphasis added).

In concluding that DNA statistical probability calculations did not need to account for genetic substructuring within the larger heterogenous populations, the Maryland Court of Appeals held:

> Since the majority of scientists now believe that the effects of population substructuring are relatively insignificant, it has become unnecessary to develop data for very small population subgroups.

*Id.* at 240.

We note that the authority on which Bolin relies predates all of the scientific studies cited by the Maryland Court of Appeals in *Armstead.* While in 1992 there may have been scientific debate concerning the effects of population substructures on DNA statistical probabilty analysis, recent empirical studies have demonstrated that such population substructuring does not affect the validity of DNA statistical probability calculations based on one of the major population groups. *See Armstead,* 673 A.2d at 235-40. Accordingly, we reject Bolin's contention that the DNA probability evidence in the instant case was flawed because the various experts did not take into account population substructure.

This court has repeatedly assessed the admissibility of scientific evidence in terms of trustworthiness and reliability. Santillanes v. State, 104 Nev. 699, 704, 765 P.2d 1147, 1150 (1988). Because the overwhelming weight of authority has established that DNA analysis utilizing the PCR technique is reliable and trustworthy for use within the forensic context, *see* United States v. Hicks, 103 F.3d 837, 844-47 (9th Cir. 1996), *cert. denied*, 520 U.S. 1193, 117 S. Ct. 1483 (1997); United States v. Beasley, 102 F.3d 1440, 1444-48 (8th Cir. 1996), *cert. denied*, 520 U.S. 1246, 117 S. Ct. 1856 (1997); State v. Lyons, 924 P.2d 802, 804-14 (Or. 1996); People v. Pope, 672 N.E.2d 1321, 1325-28 (Ill. App. Ct. 1996); State v. Gentry, 888 P.2d 1105, 1117-18 (Wash. 1995), we hold that DNA results obtained through the use of the PCR technique are admissible for use within the forensic context. Further, based on the weight of scientific authority, we hold that DNA statistical probability calculations need not take into account genetic population substructure to be valid and admissible. Accordingly, the district court did not err in admitting DNA statistical probability evidence.[6]

*The district court did not err in denying Bolin's objections to certain jury instructions*

During trial, the district court overruled Bolin's objection to Instruction No. 21[7], and rejected his proposed instruction E.[8] On

---

[6]Bolin also asserts that the district court erred when it allowed a photo of Ricks, taken when she was alive, to be admitted into evidence. Bolin argues that the photo was not relevant to the crime and that its probative value was substantially outweighed by the danger of unfair prejudice. The decision to admit evidence is "within the district court's sound discretion" and will not be disturbed on appeal unless "manifestly wrong." Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). The photo was introduced to identify Ricks, and to establish the color of her hair in order to distinguish her hair from the foreign hair found on her body. We conclude that the district court did not err in admitting this photograph.

[7]Jury Instruction No. 21 provided:

Evidence of a person's character or a trait of his character or evidence of other crimes, wrongs or acts, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion.

However, such evidence is admissible for other purposes, such as proof of motive, intent, knowledge, or identity, and as evidence that the person possesses a specific emotional propensity for sexual aberration.

[8]Bolin's proposed Jury Instruction E provided:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may be admissible for other purposes such as proof of motive, intent, plan, or identity.

appeal, Bolin argues that the district court erred in overruling his objection to Instruction No. 21 because language from that instruction which reads "specific emotional propensity for sexual aberration" is vague and suggestive of Bolin's prior criminal conduct to show bad character.

In general, the district court does not err by refusing to give a jury instruction that is substantially covered by another instruction provided to the jury. Ford v. State, 99 Nev. 209, 211, 660 P.2d 992, 993 (1983). Further, a jury instruction is proper where it merely states the law rather than instructs the jury to find a presumed fact against the accused. *Id.* at 215, 660 P.2d at 995.

In McMichael v. State, 94 Nev. 185, 189, 577 P.2d 398, 401 (1978), *overruled on other grounds by* Meador v. State, 101 Nev. 765, 711 P.2d 852 (1985), we concluded that "in sex crimes generally a more liberal judicial attitude exists in admitting evidence of prior and subsequent proscribed sexual conduct." Additionally, in Findley v. State, 94 Nev. 213, 215, 577 P.2d 867, 868 (1978), we stated that "[e]vidence showing that an accused possesses a specific emotional propensity for sexual aberration is relevant, and outweighs the prejudicial possibility that a jury might convict for general rather than specific criminality."

Based on our review of the two jury instructions, we conclude that Bolin's proposed Instruction E was substantially covered by Jury Instruction 21. Further, we conclude that Instruction No. 21 accurately instructed the jury on the law of this state. Accordingly, we conclude that the district court did not err in overruling Bolin's objections to Instruction No. 21 and rejecting Bolin's proposed Instruction E.

Additionally, Bolin argues that the district court erred in overruling his objections to Instruction No. 18, which was the reasonable doubt instruction given pursuant to NRS 175.211.[9] On

---

[9]Instruction No. 18 provided:

The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

appeal, Bolin argues that Instruction No. 18 is unconstitutional because the word "actual," and the phrases "abiding conviction of the truth," and "weighty affairs of life" suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. We disagree.

This court has "repeatedly held that jury instructions on reasonable doubt given pursuant to NRS 175.211 are constitutional." Milton v. State, 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995) (footnote omitted). Pursuant to this standard, the jury was properly instructed, and we decline Bolin's invitation to reconsider our position on this issue. Accordingly, the district court did not err overruling Bolin's objection to Instruction No. 18.

*Penalty Phase*

> *The aggravating circumstance contained in NRS 200.033(4) is constitutional*

The aggravating circumstance contained in NRS 200.033(4) provides, in relevant part:

> The murder was committed while the person was engaged . . . in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary . . . and the person charged:
> (a) Killed or attempted to kill the person murdered.

Bolin argues that this aggravator is unconstitutional because it fails to narrow the class of death-eligible defendants.

Our prior decisions have consistently upheld the constitutional validity of NRS 200.033(4). *See, e.g.,* Atkins v. State, 112 Nev. 1122, 1134, 923 P.2d 1119, 1127 (1996), *cert. denied,* 520 U.S. 1126, 117 S. Ct. 1267 (1997). We decline Bolin's invitation to revisit this issue; consequently, we conclude that Bolin's argument is without merit.

> *Bolin was properly sentenced*

Bolin argues that his due process rights were violated when the district court denied his motion to be sentenced on the sexual assault and kidnapping charges prior to the penalty hearing.[10] In

---

[10]Bolin also argues that his constitutional rights were violated when the State, in arguing for the death penalty, commented on his future dangerousness and his failure to become rehabilitated during his approximately twenty years of incarceration for other offenses. Specifically, Bolin argues that in rebutting the State's future dangerousness argument, he should have been

support of his argument, Bolin relies on Russell v. State, 607 So. 2d 1107, 1118-19 (Miss. 1992), wherein the Mississippi Supreme Court vacated the defendant's death sentence after concluding that due process mandated that the habitual offender status of a defendant be determined prior to the capital penalty hearing.

During the penalty phase, the district court instructed the jury regarding the sentencing of Bolin's non-capital offenses as follows:

> In the present case, you have also convicted the defendant of the crimes of sexual assault and kidnapping. This Court shall consider a sentence at—this Court shall—strike that. This Court shall conduct a sentencing hearing and impose a sentence on those crimes. Prior to the sentencing hearing on those crimes, the State has indicated that it will file a motion which requests this Court find that the defendant is a habitual criminal. If this Court does find that the defendant is a habitual criminal, then the sentence which will be imposed for each crime, sexual assault and kidnapping, shall be life with or life without the possibility of parole.
>
> If this Court imposes a sentence of life with the possibility of parole, the defendant will be required to serve at least 20 years in prison before he is eligible to be considered for parole. If this Court imposes a sentence of life without the possibility of parole, the defendant will not be eligible for parole.
>
> In the event that the Court does not find the defendant to be a habitual criminal, then the possible sentence for first degree kidnapping is life imprisonment with eligibility for parole when a minimum of five years have been served or a definite term of 15 years with eligibility of parole beginning when a minimum of five years has been served. The possible sentence for sexual assault is life imprisonment with eligibility for parole when a minimum of 10 years has been served or a definite sentence of 25 years with eligibility of parole beginning when a minimum of 10 years has been served.
>
> The sentences to be imposed for the commission of sexual

---

allowed to instruct the jury that life without the possibility of parole meant that he would never have an opportunity to return to free society. We conclude that this argument is without merit. Based on our review of the record, we conclude that the jury was adequately informed of the meaning of life without the possibility of parole as evidenced by the trial testimony of the Chairman of the Nevada State Parole Board and through defense counsel's closing arguments during the penalty phase. Further, "[i]n capital cases . . . the defendant's future dangerousness is a consideration on which the State may rely in seeking the death penalty." Simmons v. South Carolina, 512 U.S. 154, 175, 114 S. Ct. 2187, 2200 (1994) (O'Connor, J., concurring in judgment).

assault and kidnapping may be ordered to run concurrently to each other or consecutively to each other. The sentences to be imposed for the commission of sexual assault and kidnapping, may also be ordered to run consecutive—to run concurrently—strike that. May also be ordered to run concurrent. I'm going to read the sentence over again.

The sentences to be imposed for the commission of the sexual assault and kidnapping may also be ordered to run concurrently or consecutively to the sentence you impose for first degree murder.

In People v. Rodriguez, 914 P.2d 230, 281 (Colo. 1996), the Colorado Supreme Court concluded that the trial court's failure to impose sentence on the defendant's non-capital offenses prior to the penalty phase did not violate the defendant's due process rights because the submitted jury instructions provided the jury with a fundamental understanding of the defendant's potential sentencing. As in *Rodriguez,* we hold that the extensive instruction quoted above provided the jury with a fundamental understanding of Bolin's potential sentencing. Accordingly, we conclude that Bolin was properly sentenced and that the district court did not err in denying Bolin's motion to be sentenced on the sexual assault and kidnapping charges prior to the penalty hearing.

*The district court did not abuse its discretion by allowing victim impact testimony*

Bolin argues that the district court abused its discretion in admitting victim impact testimony during the penalty hearing because the probative value of such testimony was substantially outweighed by the danger of unfair prejudice. Three people offered victim impact testimony during the penalty phase: Ricks' husband, mother, and father. After cautioning the prosection to limit victim impact testimony to a general nature, Ricks' mother testified as follows:

Q   Did you share a special relationship with your daughter [Ricks]?

A   Yeah, we did. She was my clown.

Q   What do you mean by that statement?

A   She was funny. When she was little, it was like she was on a stage all the time. She could always make you laugh and I always thought she would outgrow it when she got a little older. Fortunately for us, she never did.

Q   Were there other qualities or attributes of [Ricks] that you distinctly remember of her from your recollection?

A   There's a lot of neat things about [Ricks]. She was cute and smart and lovable and funny. She was just a delightful person to be around. She had lots of friends. Her sisters were two of her best friends. Everybody that met her, enjoyed her.

Q   Can you describe the loss, as it relates to you as a mother?

A   I could tell you all the words, the sadness and the depression, and the anger, and the pain, but unless you've been there, you can't. It hurts and I miss her. And its been a year. It hasn't gotten any easier.

She was 21 years old, but she was still my baby. I have fears for my other girls now that I didn't have before. My need to protect them is almost overbearing sometimes. It's made changes in all of our lives that can't be fixed no matter what goes on in the courtroom or any place else. It can't be fixed.

Q   As you thought about [Ricks] in the course of her life, did she have a contribution to society?

A   Yes she did. Other than just being a joy to be around, she was a CNA, a certified nurse's assistant, which she enjoyed and registered to start school in August to be a surgical assistant. Not even the technical things she would have learned and been able to do, but the support that she could give people, a genuine caring about other people and who knows how many people she would have had contact with that she could have, could have given something to them.

Q   Any other thoughts that you have about [Ricks] that you wish to share?

A   I wish everybody could have known her. I talk to her and tell her about the babies and what they are doing. I miss being able to hold her. We're a pretty huggy family and not being able to hold her is hard. She's going to be missed by lots of people.

Q   Thank you.

Ricks' husband provided the following victim impact testimony:

Q   The specific area that I want you to give some thoughts on is can you tell us a little bit about [Ricks'] personal character?

A   My wife was a loving person, a caring wife, a best friend, kind of person that if—you know, I remember one Christmas time we didn't have any money to buy each other

presents and somehow she found a way to get me some presents. That's the kind of human being she was.

She was full of life. (Witness crying.)

She was full of life. That's what kind of person she was.

Q   Can you tell us or have you prepared your thoughts on a little bit about the impact of this crime as it's related to you and your family?

A   It's turned my life upside down. I'm upset at myself because going through all this, I'm so naive and I think everybody is naive on the face of this earth because you don't know what you have until it's gone . . . .

. . . .

Q   Is there a loss to society?

A   A tremendous loss to society, tremendous loss to society. My wife is beautiful on the inside and a beautiful person on the outside.

Additionally, Ricks' father discussed his tremendous loss as a parent and described his daughter as beautiful, intelligent, and sensitive.

Evidence pertaining to the victim and the impact of the murder on the victim's family is relevant to the jury's decision as to whether the death penalty should be imposed. Lane v. State, 110 Nev. 1156, 1165-1166, 881 P.2d 1358, 1365 (1994), *cert. denied,* 514 U.S. 1058, 115 S. Ct. 1444 (1995), *vacated in part on other grounds by* Lane v. State, 114 Nev. 299, 956 P.2d 88 (1998). Based on our review of the victim impact testimony, wherein the witnesses adhered to the district court's admonishment to limit their victim impact testimony to that of a general nature, we conclude that the district court did not abuse its discretion in allowing the victim impact testimony of Ricks' family members.

## CONCLUSION

Because of the similarities between Bolin's 1975 rape and kidnapping of Morriss and Ricks' murder, we conclude that the district court did not err in admitting evidence of Bolin's prior bad acts for the purpose of establishing Bolin's identity pursuant to NRS 48.045(2). Further, we conclude that Sirvaag's one-on-one identification of Bolin at the detention center was not unnecessarily suggestive. Consequently, we conclude that the district court did not err in allowing the admission of this evidence.

We additionally conclude that the searches and seizures executed upon Bolin on July 16, 1995, and July 18, 1995, were constitutionally valid. Therefore, the district court did not err in

allowing the admission of evidence obtained as a result of these searches.

Because of the established reliability of hair comparison analysis, we conclude that the district court did not err in allowing the admission of serologist Cook's testimony regarding his examination of Bolin's hair. Additionally, because of the weight of authority recognizing the reliability of the PCR method of DNA analysis, along with the scientific authority indicating that there is no need for DNA statistical probability calculations to account for genetic population substructuring, we conclude that the district court did not err in admitting the proffered DNA statistical probability evidence.

Further, we conclude that the district court did not err in overruling Bolin's objections to numerous jury instructions. Additionally, we reaffirm the constitutionality of the aggravating circumstance codified at NRS 200.033(4). Lastly, we conclude that Bolin was properly sentenced and that the district court did not abuse its discretion in allowing the proffered victim impact testimony.

Based on the foregoing, we affirm Bolin's conviction and sentence of death.[11]

SPRINGER, C. J., and SHEARING and YOUNG, JJ., concur.

---

[11]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.