**UNITED STATES of America**

v.

**John CUFF, Defendant.**

**No. S11 96 CR. 515(MBM).**

United States District Court, S.D. New York.

Feb. 17, 1999.

Mary Jo White, Christine Y. Chi, Andrew S. Dember, Sharon L. McCarthy, Assistant U.S. Attorneys, New York City, Irving Cohen, New York City, for the Southern District of New York.

Carl J. Herman, Co–counsel, Livingston, NJ, William C. Thompson, Special Counsel, for John Cuff.

## OPINION AND ORDER

MUKASEY, District Judge.

The indictment in this case charges defendant John Cuff with participating in a criminal organization known as the "Family" or the "Preacher Crew," whose members dealt drugs, principally cocaine in a form known as crack, and committed numerous acts of violence, including 17 actual murders and other conspiracies and attempts to murder, as well as several robberies and acts of extortion. Among the murder and conspiracy counts naming Cuff are Counts 22 and 23, which charge him with conspiracy and murder, respectively, in the January 1994 slaying of Hayward Shine. The government proposes to prove that murder with eyewitness testimony that Cuff participated in the slaying of Shine, and that Shine scratched Cuff's face in the preceding struggle. (Gov.Mem. in Opp'n to Def. John Cuff's Motion to Exclude DNA Evidence at 2) The government proposes also to introduce the results of a DNA test known as polymerase chain reaction ("PCR"), which was performed on fingernail scrapings and blood samples from Shine taken during autopsy, and on blood samples from Cuff. This test is said to prove that tissue found under Shine's fingernails contained DNA not his own, and that Cuff cannot be excluded as the source of that foreign DNA.

Cuff moves *in limine* to exclude the government's evidence on two bases: First, he argues that, unless the government introduces statistical evidence on the prevalence in the general population of the DNA characteristic present in the tissue under Shine's fingernails that was not found in Shine's DNA but was found in Cuff's, the jury will have no way of assessing how incriminating the finding is that Cuff cannot be excluded as the source of the DNA. Second, Cuff argues that errors in conducting the test, including testing a blood sample that was not Shine's, make the results so unreliable as to be inadmissible as a matter of law.

For the reasons stated below, the motion is denied.

## I.

■ The results of PCR analysis have been received in numerous cases, and Cuff does not challenge the admissibility of PCR testing itself. Therefore, general familiarity with DNA and its role in determining the biological characteristics of living things, as well as with such esoterica as the double helical structure of DNA and the pairing of the four organic bases along its strands, may be assumed for current purposes. As described in *United States v. Hicks,* 103 F.3d 837 (9th Cir.1996), *cert. denied,* 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997), two different kinds of DNA analysis can yield two different kinds of results:

> RFLP analysis, which often generates specific results and statistical "matches" of a sample to a particular individual, requires a relatively large sample with a high quality in order to generate viable results. Because forensic evidence is sometimes old, degraded, or of smaller quantity than RFLP requires, the newer PCR testing method is frequently employed by forensic scientists.
>
> The PCR method can test much smaller samples than the RFLP procedure. However, PCR testing is generally not used as a method to establish a statistical "match" between a sample and an individual, but, rather, is used as a technique to *exclude* certain individuals as possible contributors to a particular sample.

*Id.* at 845. Also as described in *Hicks,* for the purposes of legal analysis, the results of PCR testing are much like the results of blood type or hair sample type testing:

> Each individual has a particular "type" at appears following PCR testing.... Experts ... agree that there are only 21 possible types that can be found in humans. The frequency of occurrence for each PCR type varies throughout the human population. In

this way, PCR testing can be compared to the more traditional methods of forensic testing, including the use of blood type evidence (under the ABO system) or hair sample evidence. Neither of the traditional methods singles out a particular individual as matching a particular sample, but both methods can exclude individuals as possible contributors if they are not within the blood type or hair sample type. The use of PCR typing to exclude individuals as possible contributors to a particular DNA sample is strikingly similar.

*Id.* For the reasons suggested in the above quotations, *Hicks* held that the results of PCR analysis were admissible, without statistical evidence on the prevalence of the PCR type at issue, to show that none of three defendants could be excluded as the source of DNA recovered from a victim. *See id.* at 844.

■ Here, it bears mention that blood typing to support the conclusion that a defendant cannot be excluded as the source of blood recovered from a crime scene is admissible in this Circuit as relevant within the meaning of Fed.R.Evid. 401. *See United States v. Bari,* 750 F.2d 1169, 1181 (2d Cir.1984). As noted, the test the government proposes to offer concluded that some DNA from Shine's fingernail scrapings was inconsistent with Shine's own DNA type but consistent with Cuff's. (*See* March 28, 1997 Report of Office of Chief Medical Examiner at 3) Cuff's argument against the admissibility of this evidence is based on equating, and therefore confusing, a finding of a DNA match identifying Cuff, to the exclusion of all others, as the source of DNA found under Shine's fingernails, with a finding that merely includes Cuff within a large group of possible sources for the DNA found under Shine's fingernails. For example, in his reply brief, Cuff cites portions of reports by the National Research Council that apply, by their terms, to DNA

matches.[1] Cuff therefore rejects the result in *Hicks*, which held that PCR analysis showing consistency of type between two DNA samples is admissible without statistical evidence, and does so in terms that are both harsh and irrelevant:

> The court did not address (apparently because it was not raised) the question of how a meaningful conclusion can be drawn from evidence of a DNA match without information on the rarity of the matching characteristics. Indeed, in a footnote, the court state[d] that "[a]s a tangential benefit, the elimination of statistics from the Government expert's conclusion probably also made the results more understandable and less confusing to the jury." 103 F.3d at [846 n. 10]. This statement is nonsensical. Without statistical data on the frequency of the matching characteristics in the relevant reference population ... the jury was left to speculate about the value of the DNA evidence. To call this result a "tangential benefit" is absurd. It seems obvious that counsel simply failed to inform the court of the underlying issue.

(Br. and App. of Def. John Cuff in Support of Motion to Exclude DNA Evidence at 12; *see also* Cuff Reply Brief at 6 (referring to *Hicks* as "heedless")) Calling the absence of statistical data a "benefit" might well be "absurd" and invite speculation on the failures of appellant's counsel in *Hicks* if *Hicks* had involved a positive match. But it did not. It involved no more than a finding that three assailants all fell into the same general genetic type as the source of suspect DNA. *See Hicks*, 103 F.3d at 844. That is the same finding proffered here, which is admissible for the same reasons as the corresponding finding in *Hicks*.

Finally, although it should go without saying that the court will not permit the proffered evidence to be used in a way that distorts its significance, that may have to be said in view of Cuff's repeated citation to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court defined the responsibility of federal trial courts to assure that proffered scientific evidence is in fact scientific, and will be of use to the trier of fact in deciding an issue to be tried. *See id.* at 592, 113 S.Ct. 2786. In order to do so, trial courts must assess whether a proffered scientific theory can be and has been tested, whether it has been subjected to peer review and publication, and whether it has achieved general acceptance, *see id.* at 593–94, 113 S.Ct. 2786, in addition to examining "the known or potential rate of error." *Id.* at 594, 113 S.Ct. 2786. The last consideration would seem to relate to the error rate for the test itself, but it suggests also that the trier of fact must be made aware, in general, of the degree of specificity of the finding being proffered. Here, it seems likely, in view of Cuff's submissions, that at least on cross-examination it will be brought out that non-exclusion of Cuff means also non-exclusion of tens if not hundreds of thousands of others in the New York area alone.

## II.

■ Cuff's argument for exclusion of the PCR analysis based on testing errors warrants only brief discussion. The laboratory reports submitted by the parties suggest that laboratory personnel in the Office of the Chief Medical Examiner

---

1. The reply brief reads, in relevant part, as follows:

    National Research Council, *DNA Technology in Forensic Science*, p. 74–75 (1992) ("DNA 'inclusions' cannot be interpreted without knowledge of how often a match might be expected to occur in the general population"); National Research Council, *The Evaluation of Forensic DNA Evidence*, p. 192 (1996) ("[i]t would not be scientifically justifiable to speak of a match as proof of identity in the absence of underlying data that permit some reasonable estimate of how rare the matching characteristics actually are.")
    (Reply Br. of Def. John Cuff in Support of Motion to Exclude DNA Evidence ("Cuff Reply Brief") at 1–2 n. 2)

("OCME") initially tested the scrapings recovered from under Shine's fingernails against blood that was not Shine's, and concluded that the DNA in those scrapings did not match Shine's own DNA. Three OCME reports embody that error, and compound it with reference to the victim as "her" and, in one report, reference to a vaginal swab. (*See* January 4, 1994 OCME Report at 1; June 4, 1996 OCME Report at 3; September 16, 1996 OCME Report at 1) In March 1997, the error was discovered. Shine's case file was 94–0146; apparently, a blood sample stored in file 95–0146, instead of Shine's own sample in case file 94–0146, had been tested against the material recovered from under Shine's fingernails. The error was corrected in a report dated March 27, 1997; the test that compared the DNA in Cuff's blood with the DNA recovered from under Shine's fingernails and with the DNA in Shine's own blood, which generated the results at issue on this motion, was described in a report dated March 28, 1997.

All of this may well be grist for cross-examination of whoever testifies to the procedures at the OCME laboratory. However, it provides no basis for excluding evidence of the test results after the error was discovered. The initial testing of an erroneously selected sample does not mean that every step thereafter is so inherently unreliable as to make the results of later testing inadmissible as a matter of law. The weight to be attached to those later results is for the jury to decide.

\*     \*     \*     \*     \*     \*

For the above reasons, Cuff's motion to exclude the DNA evidence proffered by the government is denied.