*822 OPINION OF THE COURT
Kenneth R. Fisher, J.
Charged with first degree robbery and first degree sodomy on the sole basis of DNA evidence linking the. defendant with the sodomy victim, defendant moves to suppress all evidence derived from the blood sample used for the DNA analysis. The blood sample was taken by Erie County authorities in connection with another case. The order was signed on February 15, 2000, after written application was made pursuant to Matter of Abe A. (56 NY2d 288 [1982]). Defendant attacks the sufficiency of the affidavit supporting the application for the order on the ground that the People did not establish probable cause to believe that the defendant committed the crime in Erie County. Defendant invokes the three-fold test of Matter of Abe A. (supra) which is that “a court order to obtain a blood sample of a suspect may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a ‘clear indication’ that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable.” (Id. at 291.)
A preliminary question is presented whether the issue defendant raises is reviewable in this proceeding. There are two aspects to this: whether the court has jurisdiction to review a blood draw order issued in another county, and whether a determination of the probable cause issue in Erie County last month (the Erie County case has progressed along the same time line as this one) has preclusive effect here. On the first aspect, defendant points out that “the corporeal evidence order, like a search warrant, may be challenged by suppression motion in the event that petitioner is charged and may be reviewed on direct appeal in the event he is convicted.” (Matter of Tucker v Buscaglia, 262 AD2d 979 [4th Dept 1999].) The People concede that this court has jurisdiction to review the Erie County blood draw order, and it appears that the court must do so in resolving the motion to suppress. (Matter of James N. v D’Amico, 139 AD2d 302, 305 [4th Dept 1988].)
The order at issue in this case, however, was made in a proceeding in Erie County, and was reviewed on a pretrial suppression motion in the criminal case that resulted from the blood draw there. (See People v Afrika, Sup Ct, Erie County, Sept. 10, 2001, indictment No. 98-2639, slip opn.) The decision in the Erie County case denied suppression on the grounds that (1) “the rape kit DNA comparison alone provided suf *823 ficient probable cause to permit the granting of the blood draw application” (id. at 6), (2) the DNA comparison made it clear that relevant material evidence would result from the drawing of blood (id. at 8), and (3) the order granting the application provided that a safe and reasonable method for the taking of blood would be undertaken. (Id.) The parties have represented that the defendant was tried in Erie County very shortly after the motion to suppress was denied, and that he was convicted in late September.
Anticipating the ruling in Erie County, the People in this case, on oral argument held last August, contend that the determination in Erie County of probable cause together with the finding that the other Matter of Abe A. requirements were met precludes independent consideration of the same in this proceeding. They contend further that the court need only turn to People v King (232 AD2d 111, 117-118 [2d Dept 1997]) to “conclude that it was neither unreasonable nor impermissible to utilize the defendant’s blood sample” taken in the Erie County case to further the Rochester investigation resulting in this indictment. (Id. at 117.) The King case does not address the collateral estoppel issue. The Court found it necessary in King to determine the lawfulness of a blood draw order issued in a collateral case to resolve a motion to suppress (id. at 116), but there was no prior determination of a suppression motion in connection with the criminal proceeding in which the blood draw order was issued. Further examination beyond King is necessary to resolve the collateral estoppel issue.
The Supreme Court has not decided whether collateral estoppel can be applied against a defendant in a criminal case. (See United States v Gallardo-Mendez, 150 F3d 1240, 1242 [10th Cir 1998]; United States v Pelullo, 14 F3d 881, 890 [3d Cir 1994] [both making that observation and holding generally that collateral estoppel cannot be applied against a criminal defendant].) The New York Court of Appeals has twice left open the issue whether collateral estoppel or “issue preclusion should never be employed against a criminal defendant at any stage of the case.” (People v Aguilera, 82 NY2d 23, 31 [1993] [emphasis supplied], citing People v Plevy, 52 NY2d 58 [1980].) In each case, the issue was not reached because the doctrine was found inapplicable “in any event.” (People v Aguilera, 82 NY2d at 31.) The court has found only one reported New York case in which collateral estoppel was applied against a criminal defendant. (People v Carroll, 200 AD2d 630, 631 [2d Dept 1994].) Nevertheless, “relevant decisional law demonstrates *824 that application of the doctrine in criminal cases is extremely limited.” (People v Hilton, 266 AD2d 233, 234 [2d Dept 1999]; see e.g. People v Rumph, 267 AD2d 1093 [4th Dept 1999].) The two criminal proceedings at issue in this case have run a roughly parallel course, and there is an open question whether the Erie County order, entered only a month ago, lacks the requisite finality necessary for application of collateral estoppel. (People v Aguilera, 82 NY2d at 31, n.) The pleadings and motion papers in the Erie County case were not submitted to this court. Furthermore, in deciding whether to apply collateral estoppel “the preeminent concern is to reach the correct result.” (Id. at 30.) For these reasons, and because both the Supreme Court and our Court of Appeals have yet to decide whether collateral estoppel can ever be applied against a defendant in a criminal case, it is appropriate to decline the People’s invitation to apply the doctrine here, and to give plenary consideration to the issues presented by defendant’s motion to suppress.
The affidavit supporting the blood draw application in Erie County, sworn to by Assistant District Attorney Thomas M. Finnerty, stated that an armed robbery occurred at Marshall’s department store in Cheektowaga on October 27, 1998, during which a 25-year-old woman was sexually assaulted. The description given of the suspect was only that he was a black male wearing a ski mask and holding a gun. After the assault, the victim was transported to the Erie County Medical Center where “a sperm fraction was recovered.”
According to Finnerty’s affidavit, but for reasons undisclosed, investigation ultimately focused on the defendant who, it was alleged, resided in Rochester, New York, and was previously arrested in Rochester on September 1, 1998, “for the crimes of rape in the first degree and sodomy in the first degree.” Finnerty further averred that a “sperm fraction” was recovered from the victim in the Rochester case, and that the Monroe County Public Safety Lab conducted a DNA analysis/ comparison of the sperm found on the Rochester victim and the sperm found on the Erie County Marshall’s department store victim. An Erie County forensic serologist who compared the two samples concluded that the donor of the sperm found on the Rochester victim provided a DNA profile which “cannot be excluded” from the DNA profile of the donor in the Erie County case. The Erie County serologist’s report did not include a statistical analysis; it merely stated that the Rochester donor *825 “cannot be excluded as a possible contributor to the genetic material [found] in thi[s] [Erie County] specimen.”[1]
Assistant District Attorney Finnerty acknowledged in his affidavit, however, that no blood sample was obtained from the suspect in the Rochester case. No other information which connected the defendant to the Rochester victim was provided in his supporting affidavit (except the unelaborated fact of an arrest). The written blood draw application itself, therefore, did not set forth the requisite probable cause. Although hearsay information from another police department presumptively *826 may be reliable such that the Erie County Justice of the Supreme Court could use it in finding probable cause (People v Londono, 148 AD2d 753 [2d Dept 1989]; People v Fromen, 125 AD2d 987, 989 [4th Dept 1986]), his task in making the probable cause determination from the four corners of the written application is the same as that of a reviewing judge in a suppression hearing concerning a warrantless arrest (People v Parris, 83 NY2d 342, 346 [1994]), where the failure to detail the basis of the fellow officers’ information claimed to establish probable cause (here a link to the Rochester victim) would be fatal. (People v Ketcham, 93 NY2d 416, 420-421 [1999]; People v Havelka, 45 NY2d 636, 641 [1978]; People v Mingo, 117 AD2d 353, 356-357 [4th Dept 1986].) For this reason, even if the serologist’s report provided probable cause to believe that the sperm on the Rochester victim came from the same donor who deposited sperm on the Erie County victim, the blood draw application provided no basis to conclude that defendant was the donor in the Rochester case, or even was otherwise connected to the incident in Rochester for which he was arrested. Without evidence tending to make that connection, there was no probable basis to link defendant to the Erie County crime.
The Erie County Justice, in his September 10th decision, ignored the problem by finding that the issuing justice had before him the sworn statement of the Rochester victim. There is no evidence that the issuing justice had that statement, if indeed one existed, before him. In an October 22, 2001 court appearance, the People conceded that the issuing justice did not have any victim statement before him. Assistant District Attorney Finnerty made reference to the victim’s account of the incident on the oral argument before the issuing justice (slip opn at 5), but revealed only that the case was dismissed “because the victim * * * recanted her — her claim of force but never recanted that the person who did this to her was Nache Afrika in the case in Rochester.”[2] This cryptic reference, *827 however, is unavailing, because we do not know what Finnerty was referring to and there is no evidence, and no allegation by the People even, that the blood draw application itself included any information from the Rochester victim. Moreover, as a supplemental oral statement of the affiant made to the issuing justice, Finnerty’s representation (now discounted by the People) could not be considered because it was not made under oath. (US Const 4th Amend.) In short, the issuing justice had nothing before him upon which any probable cause linking defendant to the Rochester sperm sample could be found.
One aspect of this requires elaboration. As stated above, Finnerty did not reveal to the issuing justice whether the Rochester arrest was made on the basis of a victim’s statement, or some other basis, nor did he reveal whether a sworn statement existed. Finnerty obviously did not have personal knowledge of the victim’s account of the matter, and he did not reveal how he obtained knowledge of her “partial” recantation. Defendant contends that the reference to a recantation at oral argument before the issuing justice shows that, at least in one respect, the victim perjured herself, thereby requiring the issuing justice to inquire further, at least, before signing the order. The People made an elaborate presentation at oral argument before the undersigned about the circumstances of the victim’s change of position. But this dispute misses the point. Finnerty had personal knowledge of none of this; he did not swear to his account of the Rochester victim’s supposed partial recantation before the issuing justice (which the People now maintain is inaccurate); and he failed to tell the issuing justice how he came by the information. This combination of circumstances is fatal to the blood draw application. (People v Whelan, 165 AD2d 313, 321-322 [2d Dept 1991]; see also, People v Isaac, 224 AD2d 993, 994 [4th Dept 1996]; cf. People v Taylor, 73 NY2d 683, 688 [1989].) It is for this reason that the considerable deference ordinarily accorded the issuing justice’s probable cause determination cannot be given here. (Cf People v Hanlon, 36 NY2d 549, 559 [1975].) Nor can the court accord the Erie County Justice’s September 10th decision deference; that court relied on the existence of a statement we know the issuing justice did not have access to, either directly or in any identified form of hearsay.
At oral argument the court explored whether, in a case such as this, when the defendant is already incarcerated, the prob *828 able cause aspect of Matter of Abe A. (supra) applies. The People urged that the court take defendant’s already incarcerated status into account. Matter of Abe A. involved hauling a suspect off the street or out of his home, and detaining him for the time necessary to conduct the search for his blood, i.e., the blood draw. (Cf. Dunaway v New York, 442 US 200 [1979]; but see In re Nontestimonial Identification Order Directed to R.H., 171 Vt 227, 762 A2d 1239 [2000] [holding that Matter of Abe A. rests on an erroneous interpretation of Dunaway].) Arguably, where defendant is already incarcerated, the probable cause requirement should not apply, and indeed it does not in the case of violent felons subjected to blood draws for a state-wide or similar DNA data base, whether justified under a “special needs” criterion outside the criminal investigatory context (e.g., Roe v Marcotte, 193 F3d 73, 78-82 [2d Cir 1999]), or under a reduced expectation of privacy test applicable to convicted prisoners. (E.g., Jones v Murray, 962 F2d 302, 306 [4th Cir 1992]; Landry v Attorney General, 429 Mass 336, 344-345, 347, 709 NE2d 1085, 1090-1091, 1092 [1999]; Kellogg v Travis, 188 Misc 2d 164, 167-168 [Sup Ct, NY County 2001].) Although the latter approach seems apt here, the special needs concept only “concerns other than crime detection” (Chandler v Miller, 520 US 305, 314 [1997]), the fact remains that the blood draw application was made to further a criminal investigation. The blood draw itself was a “search” quite independent of the minimal seizure undertaken to facilitate it and, in view of recent Supreme Court precedent, the search cannot be divorced from the testing of the blood for search and seizure purposes, as the People urged at oral argument. (Ferguson v City of Charleston, 532 US 67, 75-76 [2001]; compare 532 US at 92 [Scalia, J., dissenting] [“only one act that could conceivably be regarded as a search * * * the taking of the urine sample”].) Where a “search” is required for a criminal case, a warrant must be obtained to authorize it unless an exception to the Warrant Clause applies. “Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant * * * [and] [w]arrants cannot be issued, of course, without the showing of probable cause required by the Warrant Clause.” (Vernonia School Dist. 47J v Acton, 515 US 646, 653 [1995].) Against this constitutional backdrop, an order pursuant to CPL 240.40 (2) (b) (v) issued in a criminal investigatory context is quite clearly in the nature of “a judicial warrant,” because it authorizes a “search” of de *829 fendant to aid a criminal investigation, and because a “warrant” is what the Fourth Amendment “generally requires” as authorization in such circumstances. (Vernonia School Dist. v Acton, 515 US at 653.) Therefore, as Abe A. faithfully holds, probable cause is the applicable standard.
The People invoked two fallback arguments at oral argument. First, the People maintain that they proceeded in utmost good faith, in reliance on a facially valid blood draw order. As the court observed at the time the argument was made, New York does not follow the good-faith exception to the exclusionary rule applied in the federal courts and many other states. (Compare United States v Leon, 468 US 897 [1984], with People v Bigelow, 66 NY2d 417 [1985].) Second, the People sought at oral argument to invoke the inevitable discovery exception to the exclusionary rule based on an anticipated effort by them to use the blood draw made by Department of Correctional Services pursuant to the Executive Law. (See People v Turriago, 90 NY2d 77 [1997].) The court required the People to detail their contention in writing, so that defendant would have a chance to respond. Only upon the making of the supplemental submissions could the court properly evaluate the need for a hearing on the same. (Id. at 87-88.) The People have indicated since that no further submissions will be made, and the point evidently has been abandoned.[3]
Conclusion
The motion to suppress is granted. The other grounds offered in support of the motion to suppress are without merit. If probable cause had been established, the rest of the Matter of Abe A. requirements would have been adequately set forth on the face of the application. The statistical analysis done by the Rochester serologist (see n 1, supra) shows why a “clear indication” that probative evidence would be found was present if probable cause properly had been established. Defendant’s multiple donor argument is unavailing. Because the serologist’s reports were appended to the warrant application, the contention that Finnerty misrepresented the true nature of the DNA evidence offered in support of the application is without merit. (See People v Hickey, 178 Ill 2d at 284-286, 687 NE2d at 923-924 [denying a Franks hearing against a similar contention *830 that a “match” overstated findings from a “preliminary” DNA test].)

. A prior serologist’s report, concerning analysis of the Rochester sample alone, also attached to the blood draw application, found that “[t]he probability of randomly selecting an unrelated individual having the same * * * profile * * * [as the sperm donor in the Rochester case] is approximately 1 in 5,920 African Americans.” Put together, the two reports establish that a DNA profile randomly occurring in 1 of every 5,920 African Americans, of which the Rochester donor is one, “cannot be excluded” from the DNA profile of the Erie County donor. Whether this is enough to provide probable cause that the Rochester donor is the same as the Erie County donor is a question the court need not reach, given the disposition above. A “preliminary result” under RFLP profiling analysis was held enough to establish probable cause in People v Hickey (178 Ill 2d 256, 285-286, 687 NE2d 910, 924 [1997] [“a contrary result would seriously undermine, if not eliminate, the usefulness of the sexual offenders data bank as a means of identifying and locating perpetrators of offenses where DNA evidence is the only meaningful evidence recovered”]).
Here, of course, we are not dealing with RFLP analysis, the admissibility of which was upheld in People v Wesley (83 NY2d 417 [1994]), but with the more modern PCR profiling technique. Expert proof of PCR profiling has been upheld in New York (People v Morales, 227 AD2d 648, 649-651 [2d Dept 1996]), even in the absence of a Frye hearing. (People v Fontanez, 278 AD2d 933, 935 [4th Dept 2000]; People v Hall, 266 AD2d 160, 160-161 [1st Dept 1999].) Elsewhere, PCR evidence admissibility has been upheld despite the absence of accompanying statistical analysis, if the expert is careful to limit her testimony to a conclusion that the donor profile “cannot be excluded” as a possible contributor. (United States v Hicks, 103 F3d 837, 846 [9th Cir 1996]; United States v Cuff, 37 F Supp 2d 279, 281-282 [SD NY 1999].) This is because PCR profiling is “generally not used as a method to establish a statistical ‘match’ between a sample and an individual, but, rather, is used as a technique to exclude certain individuals as possible contributors to a particular sample.” (United States v Hicks, 103 F3d at 845.) Evidence that a defendant “cannot be excluded” is nevertheless relevant (United States v Cuff, 37 F Supp 2d at 281; People v Mountain, 66 NY2d 197, 203 [1985]), although it “[is] almost certainly not sufficient evidence to [definitively] identify * * * [the accused] as * * * the * * * [perpetrator]” (United States v Hicks, 103 F3d at 846), unless statistical analysis also is provided. (People v Wesley, 83 NY2d at 444 [Kaye, Ch. J., concurring]; People v Mountain, supra.) Whether the statistical analysis of the Rochester donor DNA profile, the latter of which was found consistent with the DNA profile of the Erie County donor, amounts to probable cause need not be decided here, although it would seem easily to qualify. (People v Hickey, supra.)

. At oral argument before the undersigned, the People insisted that Finnerty’s above-quoted statement “was, quite frankly, inaccurate.” (Transcript of oral argument at 53.) That representation, together with the People’s insistence that the Rochester victim never committed perjury, raises a substantial question whether indeed she ever swore out a statement implicating defendant in a forcible rape. The People do not now contend that she did, although they may have been deterred somewhat by defendant’s argument that any disclosures related to that case cannot be made under CPL 160.50. For the reasons stated in the text, however, whether or not she made a sworn statement really doesn’t make a difference to the decision *827 here. The point is that the issuing justice did not, at the time he signed the blood draw order, know anything about the Rochester case; he did not have her statement, if she made one, before him.

. Similarly, the defendant sought at oral argument to supplement his motion by making an added factual basis for a Franks hearing. That effort also has been abandoned.